### In re BUCKHEAD AMERICA CORP., et al., Debtors.

### The OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF BUCKHEAD AMERICA CORPORATION, et al. f/k/a Days Inns of America, Inc., et al., Plaintiffs,

#### v.

### RELIANCE CAPITAL GROUP, INC., Reliance Group Holdings, Inc., Michael A. Levin, Frederick B. Beilstein, George E. Bello, Lowell C. Freiberg, Donald G. Raider, Howard E. Steinberg, Saul P. Steinberg, and Reliance Insurance Company, Defendants.

### Civ. A. No. 93–392–SLR. Bankruptcy Nos. 91–979 to 91–986. Adv. No. A92–84.

United States District Court, D. Delaware.

Jan. 28, 1994.

---

Edward M. McNally, John D. Demmy and Henry J. DeWerth–Jaffe of Morris, James, Hitchens & Williams, Wilmington, DE (Martin S. Siegel, Andrew Dash, Kevin S. Miller of Berlack, Israels & Liberman, New York City, of counsel), for plaintiff.

R. Franklin Balotti, Matthew J. Ferretti, Todd V. Jones and David L. Renauld of Richards, Layton & Finger, Wilmington, DE (Peter J. Kahn, R. Hackney Wiegman and Paul A. Murphy of Williams & Connolly, Washington, DC, Andrew B. Donnellan, Jr. and Richard B. Friedman of Reliance Group Holdings, Inc., of counsel), for defendants.

## MEMORANDUM OPINION

SUE L. ROBINSON, District Judge.

This matter is before the Court on defendants' motion to dismiss plaintiff's nineteen-

count amended complaint for failure to state a claim upon which relief can be granted. For reasons discussed below, the motion will be denied. Certain duplicative counts included in the amended complaint will, however, be dismissed.

## I. PROCEDURAL BACKGROUND

Debtors (Buckhead America Corporation, *et al.*, ("Buckhead") f/k/a Days Inn of America, Inc., *et al.*) filed petitions for reorganization under Chapter 11 of the Bankruptcy Code in 1991. In June, 1992, the Official Committee of Unsecured Creditors of Buckhead (the "Committee" or plaintiff) and Debtors filed a joint motion with the Bankruptcy Court seeking permission for the Committee to prosecute certain claims on Debtors' behalf and for the benefit of Debtors' creditors. The Bankruptcy Court granted the joint motion on July 18, 1992, thereby authorizing the Committee to commence this lawsuit. On July 28, 1992, the Committee filed its $250 million complaint asserting myriad claims in connection with two leveraged buyout ("LBO") transactions involving Buckhead's predecessor, Days Inn of America, Inc.

On October 5, 1992, defendants moved to dismiss the complaint on the ground that plaintiff failed to comply with the requirement established by Bankruptcy Rule 7008(a) that all claims filed in an adversary proceeding "contain a statement that the proceeding is core or non-core." On October 22, 1992, plaintiff filed an amended complaint designating counts I–IV, VIII, and X–XIII as core proceedings, and counts V–VII, IX, and XIV–XIX as non-core proceedings.

The time for defendants to respond to the amended complaint was extended by stipulation until after resolution of a dispute regarding whether plaintiff could maintain this action as against certain defendants originally named in the complaint in light of certain release and injunction provisions contained in a plan of reorganization confirmed in a bankruptcy case filed in the Southern District of New York.[1] On June 17, 1993, the Committee filed a notice of dismissal with the Bankruptcy Court voluntarily dismissing said defendants from this action. On June 18, 1993, the Bankruptcy Court "so ordered" the notice of dismissal.[2]

Defendants moved to dismiss the amended complaint on June 30, 1993. In addition, defendants demanded a jury trial on all counts of the amended complaint and filed a motion to withdraw the reference. On September 30, 1993, this Court granted defendants' motion to withdraw the reference.

## II. FACTUAL BACKGROUND [3]

In 1988, when certain of the defendants and others "directly or indirectly owned 49½% of the common stock" of Days Inn of America Corp. ("DIC"), defendants (and others originally named in the amended complaint) "caused" DIC to "go private" by having Days Inn of America, Inc. ("DIA"), DIC's wholly-owned subsidiary, pay for the acquisition of the outstanding shares of its parent company's stock. Although DIA financed the purchase of its parent's outstanding stock by incurring $175 million in long-term debt, plaintiff alleges that ownership of DIC's outstanding shares was obtained by Reliance Capital Group, L.P.[4] Of the $175 million in

---

1. These former parties-defendant are Reliance Capital Group, L.P., Reliance Associates, L.P., Drexel Reliance Capital Group Partnership, and Herbert J. Bachelor.

2. The Court has amended the case caption accordingly. Given the effect of this early dismissal on the averments of the amended complaint, which makes extensive and confusing use of labels in identifying parties (e.g., "Reliance defendants"), plaintiff will be directed to submit an amended pleading which remedies this problem. Each count shall identify by name the defendants against which it is directed. Also, the amended complaint occasionally makes confusing reference to "Reliance" without identifying to which

Reliance entity it refers. Plaintiff shall correct this as well.

3. The following factual background is based on the averments of the amended complaint. Fed. R.Civ.P. 12(b)(6).

4. A brief explanation of the parties to the subject transactions seems appropriate here. Former defendant Reliance Capital Group, L.P. ("Reliance Capital") is a New York limited partnership managed by its sole general partner, former defendant Reliance Associates, L.P. ("Associates"). At all relevant times, Associates was managed by its sole general partner, defendant Reliance Capi-

debt incurred by DIA, at least $57 million was used to purchase DIC shares from public stockholders as well as from certain defendants to this lawsuit and their affiliates. Plaintiff claims this transaction, referred to as the "Reliance Capital LBO," amounted to a fraudulent conveyance because (1) DIA received no consideration from the change in ownership of its parent's stock, and (2) the transaction resulted in DIA's insolvency or left DIA undercapitalized and unable to pay its debts.

In 1989, Reliance Capital sold all of DIC's common stock to Tollman–Hundley Acquisition Corp. for the price of $87.1 million.[5] Although THAC and TH Lodging were the purchasers of the DIC stock and Reliance Capital was the seller, plaintiff alleges that DIA financed the transaction, allegedly without receiving any consideration. In particular, DIA allegedly financed this transaction, referred to by plaintiff as the 1989 LBO, by assuming and then paying a promissory note

for $38 million to Reliance Capital and by issuing another note for $45 million. Plaintiff claims the 1989 LBO likewise constituted a fraudulent conveyance because (1) DIA received no consideration from the change in ownership of its parent's stock, and (2) the transaction resulted in DIA's insolvency or left DIA undercapitalized and unable to pay its debts.

Plaintiff further alleges that the Reliance Capital LBO and the 1989 LBO, among other things, resulted in DIA's 1991 Chapter 11 filing.[6]

In addition to its fraudulent conveyance claims, plaintiff asserts claims for breach of fiduciary duty and waste, tortious interference with certain indentures issued by DIA and allegedly breached in connection with the subject LBO transactions, and violation of various provisions of the Delaware General Corporation Law restricting a corporation's payment of dividends to its shareholders and

tal Group, Inc. ("Reliance Group"), a Delaware corporation which is an indirect wholly-owned subsidiary of defendant Reliance Group Holdings, Inc. ("Holdings"). Former defendant Drexel Reliance Capital Group Partnership ("Drexel Reliance"), a general partnership, owns a 50% limited partnership interest in Associates. Holdings, a Delaware corporation, is owned and controlled by Saul P. Steinberg ("S. Steinberg"), Robert M. Steinberg ("R. Steinberg"), George E. Bello ("Bello"), Lowell C. Freiberg ("Freiberg"), Howard E. Steinberg ("H. Steinberg"), all defendants herein, and by others. Defendant Reliance Insurance Company, a Delaware corporation, is owned by Reliance Group and certain directors and officers of an unspecified Reliance entity.

Defendants Michael A. Leven ("Leven"), Frederick B. Beilstein ("Beilstein"), Bello, Freiberg, Donald G. Raider ("Raider") and H. Steinberg (collectively "DIA Directors"), as well as former defendant Herbert J. Bachelor ("Bachelor"), were members of the DIA board of directors at all times relevant herein. Defendants Leven, Bello, Freiberg, H. Steinberg, R. Steinberg, and S. Steinberg, as well as former defendant Bachelor, were members of the board of directors of Days Inn of America Corp. ("DIC") at all times relevant herein.

5. The amended complaint alleges that "[i]n or about November 1989, Reliance sold all of the outstanding common stock of DIC to Tollman–Hundley Acquisition Corp. ("THAC"), a wholly-owned subsidiary of Tollman–Hundley Lodging Corp. ("TH Lodging")." (D.I. 3, item 12 at ¶ 29)

6. Regarding the definition of an LBO and the potential ramifications of such a transaction, Chancellor Allen explains:

> In such a transaction, a management or finance entrepreneur acquires control of a public company through borrowed funds. To some extent, such a transaction replaces equity with debt on the company's balance sheet and creates incentives for the discovery and implementation of operating efficiencies and for the sale and liquidation of inefficient operating units. The aim is value realization. On this view, which is the conventional one among economists, stockholders are greatly benefitted by an LBO even if other constituencies—especially bond holders and long-term employees—are put at risk.
>
> There now seems little doubt that, when they work, LBOs can enhance efficiency and promote value creation. More recent experience demonstrates, however, that when they don't work—when the debt burden that the enterprise is asked to bear is too great or when the structural or organizational changes that the corporation experiences are injurious—LBOs can lead to bankruptcy with its accompanying realization of financial loss.

Credit Lyonnais Bank Nederland, N.V. v. Pathe Communications Corp., 1991 WL 277613, *2 (Del.Ch.1991) (citations and footnotes omitted).

According to the amended complaint, the LBOs at issue in this litigation did not "work" and were "injurious" to the corporation, essentially because the "debt burden that [DIA] [wa]s asked to bear [was] too great," which in turn "lead to bankruptcy with its accompanying realization of financial loss."

purchase of its own shares of capital stock. The final count of plaintiff's amended pleading seeks relief on an "alter ego" or "piercing the corporate veil" theory of liability. All claims asserted in the amended complaint arise from the two aforementioned LBO transactions.

## III. DISCUSSION

Defendants seek dismissal of all nineteen counts of plaintiff's amended complaint on grounds that plaintiff failed to state a claim upon which relief can be granted. Fed. R.Civ.P. 12(b)(6); Fed.R.Bankr.P. 7012(b).

### A. Dismissal For Failure to State a Claim

■ On a motion to dismiss for failure to state a claim upon which relief can be granted, the allegations of the complaint must be accepted as true. *Cruz v. Beto,* 405 U.S. 319, 322, 92 S.Ct. 1079, 1081–82, 31 L.Ed.2d 263 (1972) *(per curiam ).* The court is bound to give the plaintiff the benefit of every reasonable inference to be drawn from the complaint. *Retail Clerks International Association v. Schermerhorn,* 373 U.S. 746, 83 S.Ct. 1461, 10 L.Ed.2d 678 (1963). Additionally, the court must resolve any ambiguities concerning the sufficiency of the claims in favor of the plaintiff. *Hughes v. Rowe,* 449 U.S. 5, 10, 101 S.Ct. 173, 176, 66 L.Ed.2d 163 (1980) *(per curiam ).* Essentially, the "court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984).

■ The amended complaint and defendants' motion to dismiss that pleading raise novel and difficult questions of law. Relevant here is the principle that "courts should be reluctant to grant a motion to dismiss when the claim in question asserts a novel legal theory of recovery. Novel theories of recovery are best tested for legal sufficiency in light of actual, rather than alleged facts." [7] It is also relevant in this regard that the amended complaint concerns complex transactions between various tangled entities. And, although the parties' extensive briefing has crystallized certain issues, others were not sufficiently developed to enable their proper disposition.

Due to these circumstances, the Court finds, as discussed herein, that many of the legal issues at bar are better left for adjudication after completion of discovery. Accordingly, defendants' motion will be denied, defendants will be directed to answer plaintiff's amended pleading, and a scheduling conference shall be ordered.

### B. Fraudulent Conveyance Claims

#### 1. Counts I, II, III, IV, X, XI, XII and XIII

■ Bankruptcy Code section 550 provides, in connection with certain transfers by a debtor which are avoidable as a fraudulent conveyance, for recovery of "the property transferred ... or the value of such property from ... the initial transferee of such transfer or the entity for whose benefit such transfer was made." 11 U.S.C. § 550(a)(1). In counts I–IV and counts X–XIII of the amended complaint, plaintiff seeks recovery against all defendants under the law of fraudulent conveyances for transfers made and debts incurred by DIA in the subject LBOs. These claims are challenged on the ground that none of the defendants in this action are "initial transferee[s]" of the subject transfers or "entit[ies] for whose benefit [the] transfer[s] w[ere] made."

Plaintiff responds by arguing that "[t]he Amended Complaint unambiguously alleges that ... $9.6 million was paid to DIC Directors and their affiliates to retire options held pursuant to a stock option plan and that shares of DIC stock owned by DIA Directors were purchased in the Reliance Capital LBO." (D.I. 3, item 29 at 11) Defendants concede that "to the extent plaintiff seeks recovery against certain of the DIC Directors for monies paid directly to them by the debtor to retire options, defendants will

---

7. *Branch v. FDIC,* 825 F.Supp. 384, 397 (D.Mass. 1993); *accord Haley v. Sorani,* 118 B.R. 753, 755 (Bankr.N.D.Cal.1990)).

not contest at this time ... that plaintiffs have stated a claim against those individuals." (D.I. 6 at 13) Defendants further concede "that plaintiffs have stated a claim against the DIA Directors to the extent those individuals were directly paid monies by the debtor for stock sold in connection with the Reliance Capital LBO." (*Id.*) Accordingly, the Court will deny defendants' motion to dismiss counts I through IV as against said defendants and as to said claims.

As to the remainder of the claims asserted in counts I through IV and counts X–XIII, defendants argue that plaintiff has not alleged sufficient facts to recover on the theory that any of the defendants were, in connection with the subject transactions and the transfers made therein, "entit[ies] for whose benefit such transfer[s] w[ere] made." 11 U.S.C. § 550(a)(1). In particular, defendants contend that these claims are legally insufficient because none of the defendants are alleged to be parties whom the debtor **intended** to benefit by making the transfers at issue.[8]

Section 550 does not necessarily impose the various requirements suggested by defendants' position. Although this statutory provision has been construed as " 'impl[ying] a requirement that, in transferring the avoided funds, the debtor must have been motivated by an intent to benefit the individual or entity from whom the trustee seeks to recover,' " *In re Bullion Reserve of North America,* 922 F.2d 544, 547 (9th Cir.1991), the court did not hold therein that said requirement is a pleading rather than a proof requirement.[9] In any event, the averments of the amended complaint and the reasonable

inferences to be drawn therefrom provide sufficient facts upon which to conclude that the transfers at issue were made for defendants' benefit.

Moreover, insofar as plaintiff's claims for recovery under section 550(a)(1) are grounded on novel legal theories, as defendants suggest, these "[n]ovel theories of recovery are best tested for legal sufficiency in light of actual, rather than alleged facts." *See Branch,* 825 F.Supp. at 397 (denying rule 12(b)(6) motion to dismiss claims grounded on section 550(a)(1)); *accord Haley,* 118 B.R. at 755. Much like defendants at bar[10], in *Branch* the defendant (FDIC–Corporate) argued that "section 550(a)(1) allows recovery from only two types of entities—a debtor of the initial transferee, or a guarantor of the debtor's debt to the initial transferee...." *Id.* at 401. In rejecting this narrow interpretation of section 550, the court in *Branch* persuasively opined as follows:

> FDIC–Corporate appears to afford section 550(a)(1) far too limited a scope. The provision applies on its face to any "entity" for whose benefit a transfer is made, and contains no express limitation upon the type of "benefit" required. Courts have, in fact, applied section 550(a)(1) to many "entities" and "benefits" outside the "paradigm" examples provided by FDIC–Corporate. *See, e.g., Max Sugarman Funeral Home, Inc. v. A.D.B. Investors,* 926 F.2d 1248, 1255–56 (1st Cir.1991) (debtor transferred assets to two entities which were entirely owned and controlled by a judgment creditor and which assumed the debtor's obligations to that creditor but not to other creditors—preferred creditor was

8. Defendants further contend that the relevant language in section 550, i.e., "the entity for whose benefit such transfer was made," does not allow a plaintiff to seek return of transferred assets from any person who may have received incidental benefits from the transfer. The nature of the benefits defendants allegedly received in connection with the subject transactions and transfers, i.e., whether "incidental" or "intended," are questions of fact which are not properly resolved at this stage of the proceedings.

9. Since the matter arose in connection with an appeal from summary judgment proceedings, the court was not even presented with any such issue. Moreover, the court in *Bullion Reserve*

did not base its ultimate decision on the fact that the plaintiff had not proven that the transfer was intended to benefit the defendant. Rather, the court concluded that the defendant "was at most a subsequent transferee, and [that] his liability must be analyzed under section 550(a)(2)." *Id.* at 548.

10. Defendants argue that *"In re Universal Clearing House Co.,* 62 B.R. 118 (D.Utah 1986), is a model of the scenario that § 550's expanded language is intended to cover," (D.I. 6 at 8–9), erroneously implying that section 550 is not intended to reach any cases outside of this "model" "scenario."

"entity for whose benefit" transfer was made).

*Id.* at 401–02 (citations omitted); *see also Haley,* 118 B.R. at 758 ("it would be nonsensical to conclude that existing case law has exhausted every possible type of entity from whom recovery may be obtained under 11 U.S.C. § 550(a)(1)"). Hence, most if not all of defendants' arguments as to the proper scope of section 550(a)(1) are better left for summary judgment or other post-discovery proceedings.

In responding to defendants' arguments, plaintiff contends that "where an entity or person controls a direct transferee of a fraudulent transfer, the controlling entity or person is held to be the party for whose benefit the transfer has been made, and a proper party from whom to recover." (D.I. 3. item 29 at 14) [11] Applying this principle to the facts at bar, plaintiff contends that "[d]efendants used their control over DIA to cause DIA to make the improper transfers and that the Reliance Capital LBO 'enriched ... [d]efendants by giving them complete control over all shares of DIC at the expense of DIA and its creditors.'" (D.I. 21 at 3) Plaintiff argues that "[t]his control was used by ... [d]efendants, who directly or indirectly owned and controlled Reliance Capital, to obtain the value of ownership of all the stock of DIC (which wholly owned DIA)." (*Id.*) And, as plaintiff notes, the "Amended Complaint ... alleges that the 1989 LBO 'enriched ... [d]efendants at the expense of DIA by having DIA pay a significant portion of the purchase price' to Reliance Capital, over which ... [d]efendants, directly or indirectly, exercised dominion and control." (D.I. 21 at 3) [12]

The allegations of the amended complaint are legally sufficient. Defendants' legal arguments regarding the purported elements of the claims at issue are somewhat premature, as already noted. The plain language of the statute simply requires that the defendant be an "entity for whose benefit such transfer was made." Plaintiff's amended complaint alleges as much.

For the foregoing reasons, the Court concludes that plaintiff alleged sufficient facts to withstand defendants' motion to dismiss the claims asserted in counts I–IV and counts X–XIII of the amended complaint. [13]

## 2. Count VIII

In Count VIII of the amended complaint, plaintiff seeks recovery against Reliance Insurance for the approximately $46.1 million Reliance Insurance allegedly received in connection with the Reliance Capital LBO. It is asserted in Count VIII that "[p]ursuant to 11 U.S.C. § 544(b), [plaintiff] is entitled to recover from Reliance Insurance all sums conveyed to it, directly or indirectly, by DIA on account of the Reliance Capital LBO." (D.I. 3, item 12 at ¶ 68) Section 544(b) permits recovery of any transfer that is voidable by a creditor "under applicable law."

---

**11.** Defendants contend that a party's ownership, dominion and control over another party who is the direct transferee of a fraudulent transfer are not sufficient grounds for a finding that the controlling party is an "entity for whose benefit such transfer was made" within the meaning of section 550. The Court rejects this argument because the issue of the precise facts which must be **proven** in order for plaintiff to prevail on this claim is not presently before the Court. For pleading purposes, it is enough that plaintiff alleges that defendants are "entit[ies] for whose benefit such transfer was made."

**12.** In addition, plaintiff offers the following argument in support of its position:

> Plaintiff[ ] believe[s] that discovery may establish that certain ... [d]efendants were immediate or mediate transferees from Reliance Capital. In that event, [p]laintiff can recover from

such subsequent transferee pursuant to Bankruptcy Code § 550(a)(2), unless such transferee takes for value, in good faith and without knowledge of the voidability of the transfer. (Bankruptcy Code § 550(b)(2)) Where, as here, [d]efendants participated in an LBO and had full knowledge of the voidability of the transfer, those defenses will be unavailable to any of the ... [d]efendants. *See Max Sugarman Funeral Home, Inc.,* [*supra* ].
(D.I. 3, item 29 at 16 n. 11)

**13.** Defendants argue that Reliance Capital, as direct transferee of the alleged fraudulent conveyances, is an indispensable party to the instant claims. The Court disagrees. The plain language of section 550(a)(1) provides for recovery of "the property transferred ... **or the value of such property from** ... the initial transferee of such transfer **or the entity for whose benefit such transfer was made.**" (Emphasis added)

Defendants contend that the instant claim is deficient because, according to defendants, "[p]laintiff failed to identify the 'applicable law' pursuant to which it [is] suing." (D.I. 6 at 27) This contention is without merit because Count VIII contains the following identification of applicable law:

> The conveyances by DIA, and the obligations incurred by DIA, in connection with the Reliance Capital LBO were without fair consideration, as defined in Section 3 of the Uniform Fraudulent Conveyance Act, adopted in New York an N.Y. Debtor and Creditor Law § 272 and constitute a fraudulent conveyance within the meaning of Section 4 or the uniform Fraudulent Conveyance Act, adopted in New York as N.Y, Debtor & Creditor Law § 273, such that ... [d]efendants should be required to turn over to DIA all amounts wrongfully transferred.

(D.I. 3, item 12 at ¶ 40 incorporated by reference at ¶ 65) Accordingly, the motion to dismiss Count VIII will be denied.

## C. Tortious Interference Claims: Counts IX and XVIII

Plaintiff's tortious interference claims are grounded on allegations that defendants tortiously caused DIA to breach certain provisions of indentures [14] pursuant to which DIA had issued various notes and debentures. The amended complaint provides the following background facts regarding the indentures:

> The 1988 and 1989 LBO's [were] the last of a series of three transactions in which [Reliance Capital and] Defendants engaged in a leveraged purchase or sale of DIA and its affiliated companies. In 1984, Reliance Capital acquired control of DIC, the parent corporation of DIA, in a leveraged buyout transaction (the "Original LBO"), for approximately $285 million, of which approximately $215 million was financed by DIA, through the issuance of notes and debentures of $185 million and payment of $30.3 million in cash.

Moreover, even prior to the [Reliance Capital LBO and the 1989 LBO], after [Reliance Capital and] Defendants acquired control of DIA, they caused DIA to issue an additional $160 million in new debt. * * *

> Each of the Indentures pursuant to which the various Notes and Debentures were issued prohibits DIA ... from making any dividend in respect of its capital stock or any direct or indirect distribution or payment in connection with the purchase or acquisition of DIA's capital stock. The various Indentures further require DIA to deal fairly, and to act in good faith, with respect to its debentureholders and noteholders. * * *

> Certain of the Indentures issued by DIA also prohibit the merger of DIA with another corporation if, after giving effect to such merger, the consolidated tangible net worth (as defined in the Indentures) of the surviving company is less than the consolidated tangible net worth of DIA immediately prior to the merger.

(D.I 3, item 12 at ¶¶ 18–21)

With respect to alleged breach of the indentures, the amended complaint contains the following relevant averments in connection with the Reliance Capital LBO:

> The Reliance Capital LBO ... was structured to improperly circumvent the restrictions in the Indentures prohibiting DIA from paying any dividend or making any direct or indirect payments in connection with the purchase or acquisition of DIA's capital stock. The ultimate source of the payment of approximately $139.9 million to DIC's shareholders, including Reliance Insurance and the DIA directors and their affiliates, was cash held by or the credit of DIA. The Indenture restrictions were and are intended to prohibit DIA's cash from being used to pay dividends or pay for the acquisition of DIA's stock. Yet, the effect of the Reliance Capital LBO was a distribution from DIA to its indirect shareholders, the holders of stock of its parent, DIC, or a payment made in con-

---

**14.** An indenture is defined as a "written agreement under which bonds and debentures are issued, setting forth maturity date, interest rate, and other terms." Black's Law Dictionary 693 (5th ed. 1979).

nection with the acquisition of the stock of DIA's parent, in violation of the Indentures.

(D.I. 3, item 12 at ¶ 28) [15]

Defendants seek dismissal of plaintiff's tortious interference claims. As to those defendants who were DIA directors ("DIA director defendants"), defendants contend in their answering brief that the directors cannot be held liable under a theory of tortious interference with *contract* because "[c]orporate directors are ... immune from liability for tortious interference with contractual relations for actions taken on behalf of the corporation that result in a breach of contract by the corporation." (D.I. 3, item 23 at 17) In responding to this argument, plaintiff contends that "[w]here, as here, corporate directors interfere with the corporation's indentures for their own benefit or the benefit of parties with which the directors are affiliated, they are considered to have acted outside the scope of their employment and the immunity relied on by defendants does not attach." (D.I. 3, item 29 at 31–33)

 Defendants concede that under New York law "a director may be divested of his immunity for inducing a breach of the corporation's contract with a third party only if 'it is shown that [the director] [1] committed a tort independent of the alleged breach or [2] acted for his own financial interest **and** not in the interest of the corporation.'" (D.I. 6 at 22 (citing *Stratford Group, Ltd. v. Interstate Bakeries Corp.*, 590 F.Supp. 859 (S.D.N.Y.1984)) While conceding this point

of law, the DIA director defendants nonetheless contend that they are entitled to immunity because there are no allegations that would establish that the DIA director defendants either (1) committed independent tortious acts, or (2) acted for their own benefit in connection with the subject LBOs. (D.I. 6 at 22–26)

In support of the first of these contentions, the DIA director defendants argue that they are immune from tortious interference liability unless it is alleged that they committed independent tortious acts which do not arise out of the same actions as the conduct allegedly constituting tortious interference. This assertion fails because defendants supply no legal authority supporting this interpretation of the law and, indeed, New York caselaw is to the contrary. *See Buckley v. 112 Central Park South, Inc.*, 285 A.D. 331, 136 N.Y.S.2d 233 (1st Dep't 1954) (cause of action for tortious interference against a corporate officer upheld over immunity defense because the acts through which defendant tortiously interfered with contract also constituted independent torts of fraud, deceit and misrepresentation). As related above, a director may be divested of his immunity for tortiously causing a breach of the corporation's contract with a third party if it is shown that the director committed a tort independent of the alleged tortious interference. In the instant case, the DIA director defendants' immunity defense must fail, at least for present purposes, because plaintiff alleges that said defendants also committed independent torts,

---

15. The amended complaint contains similar allegations in connection with the 1989 LBO:

Like the Reliance Capital LBO, the 1989 LBO was structured to circumvent improperly the restrictions in the Indentures prohibiting DIA from making any dividend in respect of its capital stock or any direct or indirect payments in connection with the purchase or acquisition of DIA's capital stock. Although [Reliance Capital] and Defendants structured the 1989 LBO to make it appear as though THAC were the source of the payment made to Reliance Capital, [Reliance Capital] and Defendants knew and intended that the payment of $39 million to Reliance Capital was to be funded with DIA's cash. The Indenture restrictions were and are intended to prohibit DIA's cash

from being used for that purpose. The effect of the 1989 LBO was a payment by DIA, the ultimate source of the payment of $39 million, to its indirect shareholder, Reliance Capital, in connection with the acquisition of stock of DIA's parent, in violation of the Indentures.

The merger of THAC into DIA also violated the provisions of certain of the Indentures which required that any merger involving DIA could not reduce DIA's consolidated net worth. The applicable covenants were breached and DIA's consolidated net worth declined because, upon the merger DIA paid the $39 million Acquisition Note and issued the $45 million Mirror Note, without receiving any value or consideration in return.

(D.I. 3, item 12 at ¶¶ 33–34)

namely, breach of fiduciary duty, self-dealing, and corporate waste.[16]

As to those defendants who were not DIA directors, defendants argue that they are immune from liability for tortious interference with the indentures because "[a] director of a parent corporation is privileged to interfere with contracts of a subsidiary to protect the parent's interests." (D.I. 6 at 26) Plaintiff responds that "any such privilege exists only where the activity constituting tortious interference is not accomplished through 'improper' or 'illegal' means" and that "[w]here, as here, the alleged tortious interference is accomplished through an illegal fraudulent conveyance scheme in violation of specific statutory prohibitions, the asserted 'immunity' does not apply." [17] Because defendants have not responded to this argument, and because the claimed tortious interference allegedly was accomplished through an unlawful fraudulent conveyance scheme, the Court will, for present purposes, allow plaintiff to maintain its tortious interference claims as against those defendants who were not DIA directors.

Defendants argue that plaintiff's tortious interference claims arising from the Reliance Capital LBO are time-barred. Relying on *Omega Indus., Inc. v. Chemical Bank,* 190 A.D.2d 843, 593 N.Y.S.2d 996, 998 (2d Dep't 1993), and "cases cited therein," defendants contend that "New York's CPLR § 214(4), which provides for a three-year limitations period, applies to all claims for tortious interference with contract." (D.I. 6 at 27) Plaintiff responds that defendants' reliance on the *Omega* case is misplaced because "neither *Omega,* nor any of the 'cases cited therein,' considered the appropriate statute of limitations for a tortious interference claim brought on behalf of a corporation against former controlling persons alleging injury to the corporation." (D.I. 21 at 9–10) According to plaintiff, the six-year limitation period provided by CPLR § 213(7) applies here.

■ Although there is authority supporting defendants' contention that CPLR section 214(4) generally applies to tortious interference claims, *see Omega, supra; see also Purves v. ICM Artists, Ltd.,* 119 B.R. 407 (S.D.N.Y.1990), other decisional authority supports the contention that CPLR § 213(7) applies to plaintiff's tortious interference claims. *See In re Argo Communications Corp.,* 134 B.R. 776 (Bankr.S.D.N.Y.1991). It appears, as plaintiff essentially concedes, that the claims at issue are time-barred unless plaintiff can take advantage of New York's six-year statute of limitations, CPLR section 213(7). New York law provides a six-year limitations period for "an action by or on behalf of a corporation against a present or former director, officer or stockholder ... to recover damages for waste or for an injury to property...." CPLR § 213(7). One question, therefore, is whether plaintiff's tortious interference claims are claims brought "by or on behalf of a corporation," within the meaning of section 213(7).

Plaintiff contends that its tortious interference claims are properly characterized as claims brought "by or on behalf of a corporation," within the meaning of section 213(7). According to plaintiff, the Committee sought leave to file the instant action in the Committee's name on behalf of the Debtors because "[t]he Debtors and Committee agreed that, because the creditors of the Debtors' estates would be the beneficiaries of any recovery on account of these claims, the Committee, representing the creditors, was the appropriate entity to prosecute these claims." (D.I. 3, item 29 at 2) Thus, it is clear that this action, although nominally brought on behalf of the debtor corporations, in essence is on behalf of the Committee itself and the creditors represented by the Committee.

Moreover, for purposes of analysis under section 213(7), the question is not so much

---

16. Although it is unnecessary to address defendants' contention that there are no allegations to establish that defendants acted for their own benefit in connection with breach of the indentures, the Court notes that the allegations of the amended complaint, together with reasonable inferences to be drawn therefrom in plaintiff's favor, satisfy this requirement as well.

17. D.I. 21 at 9 (citing *Felsen v. Sol Cafe Mfg. Corp.,* 24 N.Y.2d 682, 301 N.Y.S.2d 610, 249 N.E.2d 459 (1969); *Harden, S.P.A. v. Commodore Electronics, Ltd.,* 90 A.D.2d 733, 455 N.Y.S.2d 792, 793–94 (1st Dep't 1982); *Record Club of America, Inc. v. United Artists Records, Inc.,* 611 F.Supp. 211, 217 (S.D.N.Y.1985)).

whether this action generally is "on behalf" of the debtor corporations; rather, the appropriate question is whether the particular claims at issue (tortious interference) are brought "on behalf" of the corporation. When framed in this manner, resolution of this issue remains unclear, although it appears significant that the indentures underlying these claims are designed for protection of the creditors who are parties thereto rather than for the benefit of the corporation itself.[18] Thus, one would expect a claim for breach of the indentures (or tortious interference causing a breach) to be brought by the creditors **on their own behalf.** In any event, it is apparent that these issues cannot be properly resolved at this procedural juncture.

Therefore, for the reasons stated, defendants' motion to dismiss plaintiff's tortious interference claims will be denied.

## D. Other Claims Relating to Indentures: Counts VII, XVI, XVII

The amended complaint contains three other counts relating to alleged breaches of the subject indentures. Defendants initially (and understandably) construed these counts as raising claims under contract law. Defendants sought dismissal of these counts on the

**18.** *See, e.g., Alleco, Inc. v. IBJ Schroder Bank & Trust Co.,* 745 F.Supp. 1467, 1471 (D.Minn. 1989), where the court explained:

The term "debenture" refers to a long-term unsecured debt security, issued pursuant to an indenture, and with an indenture trustee. The relationship between the issuer (debtor) and the debenture holders (lenders) is a matter of contract. **The obligation to repay the debt runs directly from the issuer to the holders, and the other rights conferred by the debenture run from the issuer to the trustee for the benefit of the holders.**
(Emphasis added)

**19.** In Count VII of the amended complaint, plaintiff claims the following:

The Indentures pursuant to which DIA issues Notes and Debentures prohibit dividends or other direct or indirect distributions or payments to DIA's shareholders in connection with the acquisition of stock of DIA.
The payments made to the shareholders of DIC in connection with the Reliance Capital LBO, and the monies paid for the Option Repurchases, effectively constitutes dividends or direct or indirect distributions or payments to

ground that one who is not a party to a contract can not be held liable for its breach. Plaintiff responded to this argument by asserting, for the first time, that these claims actually are grounded in tort law. Plaintiff further explained that these counts seek recovery for "tortious acts of the ... [d]efendants in causing DIA to" violate the indentures. (D.I. 3, item 29 at 2)

■ Defendants contend that counts VII, XVI, and XVII should be dismissed because, *inter alia,* they are duplicative of the tortious interference claims asserted in counts IX and XVIII of the amended complaint. The Court agrees.

*According to plaintiff, "the claims made in Count VII ... are* **not** *for breach of the indentures, but rather for tortious acts of ... [d]efendants in* **causing** *DIA to ... violate the indentures by making payments to DIC's shareholders in connection with the Reliance Capital LBO and the retirement of stock options." (D.I. 3, item 29 at 29 (emphasis in original))* [19] Count IX of the amended complaint likewise seeks to impose liability for defendants' "tortious" conduct in "caus[ing] DIA to violate the Indenture restrictions" in connection with the Reliance Capital LBO. (D.I. 3, item 12 at ¶ 72) [20]

DIA's shareholders in violation of the Indentures.
The Reliance Capital LBO and the payments made in connection therewith, are transfers avoidable by a creditor holding an unsecured claim....
(D.I. 3, item 12 at ¶¶ 61–62)

**20.** Plaintiff claims the following in Count IX:

The Reliance Defendants knew that the Indentures prohibited any direct or indirect distribution or payment to DIA's shareholders in connection with the acquisition of stock of DIA and the merger of DIA if its consolidated net worth would be less than ... prior to the merger. The Reliance Defendants also knew that DIA was obliged to deal fairly, and to act in good faith, with respect to its creditors and debentureholders.
As a result of the Reliance Capital LBO, DIA paid or assumed obligations of approximately $138.9 million in making the payments to its indirect shareholders, the shareholders of its parent, DIC, to acquire the stock of DIC, without receiving any consideration in return.
The foregoing conduct by the Reliance Defendants caused DIA to violate the Indenture

Because identical and duplicative tort claims are asserted in counts IX and VII, and because Count VII contains no specific averments of fact supporting a tort claim against defendants and does not even identify itself as a tort claim, whereas Count IX contains specific allegations of fact and is identified as a claim grounded in tort, the Court will dismiss Count VII.[21] Likewise, counts XVI and XVII will be dismissed because the "tort" claims asserted therein relating to the 1989 LBO are duplicative of the more specific and properly-identified tort claims raised in Count XVIII.

### E. Breach of Fiduciary Duty and Waste of Corporate Assets

In counts V and XIV of the amended complaint, the Committee claims that the DIA director defendants breached their fiduciary duties and wasted corporate assets by their approval of and/or participation in the subject LBO transactions. These claims are grounded on the Committee's allegations that (1) such actions were taken for defendants' own benefit and not for the benefit of DIA, (2) DIA was rendered insolvent as a result of the two LBOs at issue, and (3) DIA's insolvency obligated the DIA directors "to give their ... loyalty, and owe a fiduciary duty to, the creditors of the corporation—not its shareholders." (D.I. 3, item 29 at 18)

Defendants contend that "[t]o the extent the DIA Directors took actions for the bene-

fit of DIC, its sole stockholder, and Reliance Capital, DIC's sole stockholder, such conduct is completely consistent with their duty of loyalty." (D.I. 3, item 23 at 23) Furthermore, defendants candidly opine that "in the absence of any minority interests, the parent and its shareholders are the only persons to whom fiduciary duties are owed." (*Id.* at 24) Defendants further contend that although directors may have fiduciary duties to creditors when a corporation is insolvent, such duties would have attached here only if "DIA was insolvent when the DIA Directors 'approved'" the LBOs at issue and would not have attached if insolvency occurred after such approvals were given. (D.I. 6 at 29–30)

■■■■ Defendants' contentions in this regard must fail because, as the Committee points out, "where a corporation is operating in the vicinity of insolvency, a board of directors is not merely the agent of the residue risk bearers, but owes its duty to the corporate enterprise," *Credit Lyonnais Bank Nederland, N.V. v. Pathe Communications Corp., supra,* 1991 WL 277613, at *34, including the corporation's creditors, *see id.* at n. 55. The amended complaint alleges with sufficient specificity that DIA was insolvent or was "operating in the vicinity of insolvency" at the time of the DIA directors' alleged approval of and participation in the subject LBOs.

■■■■ Defendants further contend that "plaintiff fails to allege any facts specifying

---

restrictions and the covenants of good faith and fair dealing owing by DIA to its debentureholders. The Reliance Defendants engaged in, and aided and abetted, a wrongful and wanton scheme to circumvent the Indenture restrictions. The wrongful conduct by the Reliance Defendants constitutes tortious interference with contractual and business relationships with DIA, as obligor on the debentures, and its debentureholders. DIA and its creditors have been damaged by such wrongful conduct in an amount to be determined by the Court.
(D.I. 3, item 12 at 70–72)

**21.** Plaintiff contends in a footnote that "[c]ontrary to defendants' assertion ..., these counts [i.e., counts VII, XVI, and XVII] are separate and distinct from the counts for tortious interference...." (D.I. 21 at 5 n. 10) In support of its position, plaintiff offers the following (and nothing more):

In this context, *Buchman v. American Foam Rubber Corp.,* 250 F.Supp. 60 (S.D.N.Y.1965),

is directly on point. There, the court held that debentureholders stated a cause of action against directors and officers of the debtor who caused it to make payments to a former officer in violation of the operative indentures. The court held that this cause of action was not co-extensive with, or duplicative of, claims for waste or breach of fiduciary duty, which also were asserted in that case. *Id.* at 69.
(D.I. 21 at 5 n. 10)

This argument fails because the issue here is not, as in *Buchman,* whether plaintiff's "tort" claims raised in counts VII, XVI, and XVII are duplicative of plaintiff's claims for waste or breach of fiduciary duty raised elsewhere in the amended complaint. Rather, the issue here is whether plaintiff's "tort" claims asserted in counts VII, XVI, and XVII are duplicative of plaintiff's "tort" claims raised in counts IX and XVIII of the amended complaint.

how the DIA Directors participated in the approval of the Reliance Capital LBO or the 1989 LBO." (D.I. 6 at 29) This contention must fail because (1) the amended complaint plainly includes allegations that the DIA directors approved of and/or participated in the LBO transactions; (2) a reasonable inference to be drawn from the allegations set forth in the amended complaint is that the DIA directors' approval of and participation in the LBOs took the form of voting and other similar corporate governance activities; and (3) under the Federal Rules of Civil Procedure and the modern practice of notice pleading, a plaintiff "need only plead a concise statement of his 'claim,' Fed.R.Civ.P. 8, and need not plead evidentiary facts." *Jenkins v. General Motors Corp.*, 354 F.Supp. 1040, 1048 (D.Del.1973). Whether or not plaintiff ultimately can adduce evidence supporting its allegations of such approval and participation is a matter for subsequent proceedings.

Defendants' next argument is that the Committee's claims for waste of corporate assets should be dismissed because "[t]here are no specific factual allegations showing a gross disparity of consideration as is necessary to state a claim of waste." (D.I. 3, item 23 at 26) This contention fails because the amended complaint plainly alleges, in connection with the Reliance Capital LBO, that "Reliance Capital emerged from the transaction with complete ownership and control of DIA for which it did not pay fair consideration," and that "DIA did not receive any consideration for assuming obligations of $130 million and paying $8.9 million in cash to finance the Reliance Capital LBO." (D.I. 3, item 12 at ¶ 49 incorporated by reference into Count V at ¶ 51) Similarly, as to the 1989 LBO, the Committee avers that (1) "DIA did not receive any consideration for paying and assuming the $39 million Acquisition Note used to finance a portion of the sale [of assets in connection with the 1989 LBO]"; and (2) "DIA did not receive any

consideration for giving the Mirror Note to TH Lodging." (*Id.* at ¶ 84 incorporated by reference into Count XIV at ¶ 86)

Plaintiff's waste claims, therefore, will not be dismissed at this time.

**F. Claims Under Delaware General Corporation Law §§ 160 and 173**

In Count XV of the amended complaint, plaintiff asserts claims against the DIA director defendants for alleged violations of Delaware General Corporation Law (DGCL) section 160 and section 173.[22]

DGCL section 160 provides, in relevant part, that "no corporation ... shall ... [p]urchase or redeem its own shares of capital stock for cash or other property when the capital of the corporation is impaired or when such purchase or redemption would cause any impairment of the capital of the corporation...." 8 Del.C. § 160. Section 173 provides that "[n]o corporation shall pay dividends except in accordance with this chapter." 8 Del.C. § 173.[23] Plaintiff claims that the payments made by DIA in connection with the subject LBO transactions "were, in substance, unlawful dividends and/or stock purchases in violation of §§ 160 and/or 173 of the [DGCL]." (D.I. 3, item 12 at ¶ 92) Defendants challenge these claims on the ground that DGCL sections 160 and 173 are inapplicable to the subject LBOs because neither transaction involved "purchase" of DIA stock nor payment of a "dividend" to DIA shareholders.

Relying primarily on *Crowthers McCall Pattern, Inc. v. Lewis*, 129 B.R. 992 (S.D.N.Y.1991), plaintiff contends that the subject LBOs should be "collapsed" and the "economic reality of the transactions" should be considered in determining whether sections 160 and 173 (in conjunction with section 170) of the DGCL provide a basis for liability in this case. More specifically, plaintiff argues that the purchases of DIC stock and

**22.** Under DGCL section 174, upon which plaintiff relies, directors of a corporation are liable for "willful or negligent violation of § 160 or § 173." 8 Del.C. § 174.

**23.** Section 170, one of the DGCL provisions governing payment of dividends, in turn provides that "[t]he directors of every corporation ...

may declare and pay dividends upon the shares of its capital stock ... either (1) out of its surplus ..., or (2) in case there shall be no such surplus, out of its net profits for the fiscal year in which the dividend is declared and/or the preceding fiscal year." 8 Del.C. § 170(a).

payments received by DIC shareholders in connection with the subject LBO transactions are properly characterized as dividend payments by DIA and purchases of DIA stock "[b]ecause DIA was wholly owned by DIC" and, therefore, "the economic reality of the 1989 LBO and Reliance Capital LBO was that funds were paid by DIA to its economic owners, i.e., the DIC shareholders." (D.I. 3, item 29 at 24)

Plaintiff's reliance upon the *Crowthers McCall* case is well-placed. In that case, the plaintiff asserted claims under the DGCL which were quite similar to the claims at bar. Indeed, the defendants there filed a motion to dismiss challenging the DGCL claims on precisely the same grounds defendants raise here. In rejecting this challenge, the court opined:

> Courts which have previously addressed the application of [statutes similar to DGCL §§ 160 and 173] to LBO transactions have rejected arguments which concentrate on the form of the transaction rather than its substantive economic effect. In *Wieboldt* [*Stores Inc. v. Schottenstein*], 94 B.R. [488] at 488 [ (N.D.Ill.1988) ], the court, applying Illinois law, upheld the debtors' claim that its directors made an illegal distribution to shareholders in connection with a[n LBO] "because the effect of the payments of cash from HCFS [the lender which financed the tender offer] to the shareholders was to transfer *Wieboldt* assets to *Wieboldt* shareholders." 94 B.R. at 511. *See also United States v. Gleneagles Invest. Co.*, 565 F.Supp. 556, 584–85 (M.D.Pa.1983).

Here, too, at least at this stage of the proceedings, dismissal of the claim for unlawful dividends, stock purchases or stock redemptions would be inappropriate. If the plaintiff's allegations are true, as must be assumed on these motions to dismiss, the economic substance of the transactions

in question brings them within the purview of the relevant sections of the [DGCL].

*Crowthers McCall*, 129 B.R. at 1001.

In response to this argument, defendants contend that "both plaintiff and the case upon which it principally relies [*Crowthers McCall*] ignore the precisely drafted language of the dividend and redemption provisions of the [DGCL], disregard important policy considerations which counsel against the invocation of Sections 160 and 173 in these circumstances, and fail to recognize the applicability of the doctrine of independent legal significance." (D.I. 6 at 33) [24]

█ Taking the last of these three points first, the Court finds that defendants' doctrine of independent legal significance argument, as presented, cannot succeed. The doctrine of independent legal significance provides that corporate action taken pursuant to one section of the DGCL " 'is legally independent, and its validity is not dependent upon, nor to be tested by the requirements of other unrelated [DGCL] sections under which the same final result might be attained by different means.' " *Rothschild Int'l Corp. v. Liggett Group Inc.*, 474 A.2d 133, 136 (Del.1984) (quoting *Orzeck v. Englehart*, 195 A.2d 375, 378 (1963)). Because defendants do not assert that their challenged actions complied with the requirements of any section of the DGCL, they have failed to demonstrate that this doctrine inures to their benefit in connection with this claim.

Because the plain language of section 160 refers to the purchase or redemption of the corporation's "own shares," and because the subject LBO transactions involved the purchase of DIC shares rather than DIA's purchase of its own shares, defendants contend that section 160 and section 173 simply do not apply here. In support of this literal application of the relevant statutory text, defendants rely upon the following passage from the *Speiser* case:

---

24. In support of the former two contentions, defendants chiefly rely upon *Speiser v. Baker*, 525 A.2d 1001, 1008 (Del.Ch.), *appeal refused*, 525 A.2d 582 (Del.1987), and *In re C–T of Virginia, Inc.*, 958 F.2d 606 (4th Cir.1992). The latter case involved an appeal from the district court's grant of summary judgment against the plaintiff. Although that case appears to have some relevance here, defendants failed to explain with any specificity how the legal precepts set forth in this "instructive" case apply to the claims and allegations at bar.

Delaware courts, when called upon to construe the technical and carefully drafted provisions of our statutory corporation law, do so with a sensitivity to the importance of the predictability of that law. That sensitivity causes our law, in that setting, to reflect an enhanced respect for the literal statutory language.

*Speiser,* 525 A.2d at 1008.

The Court of Chancery addressed application of the following statutory language in *Speiser:*

Shares of its own capital stock belonging to the corporation or to another corporation, if a majority of the shares entitled to vote in the election of directors of such other corporation is held, directly or indirectly, by the corporation, shall neither be entitled to vote nor counted for quorum purposes.

*Id.* at 1007 (quoting 8 Del.C. § 160(c)). The particular issue *Speiser* resolved is whether shares of a parent company's stock held by a subsidiary may properly be treated as shares "belonging to" the parent corporation where, as there, "a majority of the shares entitled to vote in the election of directors of [the subsidiary] is [**not**] held, directly or indirectly, by the [parent] corporation." The court acknowledged that the statute's "literal" language did not apply to this situation because the parent corporation did not " 'hold[ ],' even indirectly, a majority of the stock 'entitled to vote' in [the subsidiary's] election of directors." The court further acknowledged that literal application of statutory text is desirable, and it is in this context that the court offered the passage upon which defendants place so much emphasis. Nonetheless, the court concluded "that stock held by a corporate 'subsidiary' may, in some circumstances, 'belong to' the issuer and thus be prohibited from voting, even if the issuer does not hold a majority of shares entitled to vote at the election of directors of the subsidiary." *Id.* at 1011.

The Chancery Court reasoned that because "the principal prohibition of the statute is directed to shares of its own capital stock 'belonging to the corporation,' " and because "[t]his phrase is not a technically precise term whose literal meaning is clear, ... it

requires interpretation." In explaining the "function of courts in interpreting statutes," the court offered the following words:

While it is our responsibility to accord to clear and definite statutory words their ordinary meaning, the process of interpretation cannot be—and has never been—entirely a dictionary-driven enterprise. Words themselves are imperfect and ambiguous symbols and the human imagination that shapes them into legal commands is inevitably unable to foresee all of the contexts in which the problem addressed will later arise. Thus, in constructing a statute:

There is no surer guide ... than its purpose when that is sufficiently disclosed; nor any surer mark of oversolicitude for the letter than to wince at carrying out that purpose because the words do not formally quite match with it.

*Federal Deposit Insurance Corp. v. Tremaine,* 133 F.2d 827, 830 (2d Cir.1943) (L. Hand, J.). A due respect for the legislative will requires a sympathetic reading of statutes designed to promote the attainment of the end sought. *See Magill v. North American Refractories Company,* Del.Supr., 36 Del.Ch. 185, 128 A.2d 233 (1956). Over four hundred years ago, Lord Coke gave guidance to English judges engaged in the process of statutory interpretation that is sound today:

The office of all judges is always to make such construction as shall suppress the mischief and advance the remedy, and to suppress subtle inventions and evasions for continuance of the mischief ... and to add force and life to the cure and remedy according to the true intent of the makers of the Act....

*Heydon's Case,* 3 Co.Rep. 7a, 76 Eng.Rep. 637 (King's Bench 1584).

*Id.* at 1008–09. The court then examined the legislative intention behind the words "belonging to," as used in section 160(c), "by a historical inquiry into the purposes meant to be served by Section 160(c) and statutes like it." *Id.* at 1009. The court found "[t]his history [to be] particularly instructive ... because it demonstrates ... that the very

evil the statute sought to address is present here." *Id.*

The question of statutory interpretation at issue in this case resembles the matter addressed in the *Speiser* case. As explained above, section 160(a)(1) prohibits a corporation under certain circumstances from purchasing or redeeming "its own shares of capital stock." Likewise, section 170 concerns itself with a corporation's payment of dividends "upon the shares of its capital stock." In *Speiser* the court construed the meaning of the phrase "[s]hares of its own capital stock **belonging to the corporation**," the emphasized portion of which the court characterized as a "phrase [that] is not a technically precise term whose literal meaning is clear." Similarly, the Court here must determine what the legislature meant in sections 160(a)(1) and 170, respectively, when it referred to a corporation's "purchase ... [of] its own shares of capital stock" and payment of dividends "upon the shares of its capital stock," which likewise are properly characterized as not "technically precise term[s] whose literal meaning is clear." Hence, it is appropriate to examine what the legislature intended by these words through a "historical inquiry" into the purposes meant to be served by DGCL §§ 160(a)(1), 170 and analogous statutes. If this history demonstrates "that the very evil the statute sought to address is present here," then it may be appropriate to apply section 160(a)(1) and/or section 170 to the facts at bar.

"There are few, if any, doctrines more firmly rooted in our jurisprudence than that the capital stock of a corporation is a trust fund for the payment of the corporate indebtedness, before any distribution among the shareholders." *Hamor v. Taylor–Rice Engineering Co.*, 84 F. 392, 395 (C.C.Del.1897).

The capital stock of an incorporated company is a fund set apart for the payment of its debts. It is a substitute for the personal liability which subsists in private copartnerships. When debts are incurred, a contract arises with the creditors that it shall not be withdrawn or applied, otherwise than upon their demands, until such demands are satisfied.

*Id.* at 395 (quoting *Sanger v. Upton*, 91 U.S. 56, 60, 23 L.Ed. 220 (1875)). The *Hamor* court further explained:

[W]hether a corporation be solvent or insolvent, the fund represented by its capital stock must remain inviolate for the protection of its creditors. In the absence of statutory authority in that behalf a corporation has no legal power to reduce this fund by any formal or voluntary act or contract on its part, to the prejudice of its creditors either then or thereafter existing, whether by distributing any part of it by way of dividend, or by giving any part of it to one or more stockholders, or by disposing of it in any other manner, except by way of changing its form to meet the exigencies of the corporate business.

*Id.* at 397.

More recently, the Supreme Court of Delaware addressed the modern statutes governing unlawful dividend payments and stock repurchases:

The statute here in question, 8 Del.C. § 174, provides in essence that directors who are guilty of "wilful or negligent violation" of the statutes governing the purchase or redemption by the corporation of its own stock or of the issuance of dividends on its own stock (8 Del.C. §§ 160, 173), "shall be jointly and severally liable at any time within six years after paying such unlawful dividend or after such unlawful stock purchase or redemption, to the corporation and to its creditors in the event of its dissolution or [insolvency]...."

*Johnston v. Wolf,* 487 A.2d 1132, 1136 (Del. Supr.1985) (emphasis removed). Quoting from the Chancery Court decision on appeal, the Delaware Supreme Court stated:

[S]tatutes (which correspond to current § 174) protecting the integrity of a corporation's stated capital aim at 'protecting those who have extended credit to a corporation and who have relied on stated capital as a trust fund for the security of creditors.' * * * The purpose of section 174 ... is to provide a cause of action to creditors who have extended credit to a corporation based on that corporation's stated capital. And when the corporation impairs that capital by an illegal redemp-

tion of stock, it depletes the creditors' "trust fund" and seriously jeopardizes their means to recover their debts.

*Id.* at 1134–35 (quotations and citations omitted).

It appears that the purposes underlying common law and statutory restrictions on a corporation's authority to purchase its own stock or pay shareholder dividends—when such transactions deplete capital and impair the corporation's ability to pay its debts—are at stake in the case *sub judice.* Plaintiff alleges that DIA's capital was impaired and its ability to pay its creditors was greatly diminished as a result of the payments DIA made in connection with the subject LBO transactions. Indeed, plaintiff alleges that "DIA was rendered insolvent as a consequence of the conveyances by DIA and the obligations incurred by DIA in connection with the Reliance Capital LBO." (D.I. 3, item 12 at ¶ 39) Defendants have not challenged plaintiff's implicit assertion that the "the very evil [these restrictions] s[eek] to address is present here."

Notwithstanding that the essential purpose underlying restrictions on a corporation's purchase of its own stock appears to be served by application of section 160(a) to the DIA payments associated with the subject LBO transactions, the Court concludes that no amount of interpretive analysis can logically result in the determination that DIA purchased or redeemed "its own shares of capital stock" in supplying funds for the purchase of DIC stock in connection with these transactions. The transactions at issue here simply do not involve purchase or redemption of DIA stock. Rather, the subject LBO transactions involve purchase of shares of capital stock in DIC, DIA's parent corporation. These purchases of DIC shares were made neither by DIA nor by DIA's parent company, DIC.[25] In the Reliance Capital

LBO, Reliance Capital, DIC's largest shareholder and then-owner of 49½ per cent of the outstanding shares of DIC common stock, purchased **DIC shares** after the DIC board approved Reliance Capital's offer to acquire all other publicly-held DIC stock. Likewise, the 1989 LBO involved THAC's purchase of **DIC stock** from Reliance Capital.

Moreover, the DIC shares exchanged in the Reliance Capital LBO and the 1989 LBO were not represented by DIA's stated capital. While it is true that DIA's capital allegedly was impaired as a result of the payments made by DIA in connection with the subject LBOs, it was not impaired as a result of DIA's purchase of "its own shares of capital stock." Whatever the nature and reality of the subject LBOs may be, it cannot fairly be said that either transaction involved DIA's purchase of its own shares of capital stock. Neither LBO involved a purchase of anything by DIA nor a purchase of DIA stock by anyone.

■ The foregoing conclusion does not mean, however, that plaintiff's claims under DGCL section 174 must be dismissed for failure to state a claim upon which relief can be granted. As related above, section 174 imposes liability for unlawful distributions and dividend payments in addition to restricting purchase of a corporation's own shares of capital stock. The parties' briefing focused on the repurchase issue and devoted little attention to the dividend facet of plaintiff's claim. Relevant authorities indicate, however, that DIA's financing of these transactions may properly be treated as an unlawful dividend payment or distribution from DIA to its parent company and sole shareholder, DIC. *See, e.g., Bell Bakeries, Inc. v. Jefferson Standard Life Insurance. Co.,* 245 N.C. 408, 96 S.E.2d 408 (1957), *overruled on other grounds by Link v. Link,* 278 N.C. 181, 179 S.E.2d 697 (1971), *as stated in Stewart v.*

---

**25.** There are authorities indicating that a subsidiary's purchase of its parent's stock may create liability under applicable unlawful repurchase statutes. In a recent treatise addressing various issues relevant to this case, the author noted that the pre–1980 Model Business Corporation Act's restrictions on a corporation's authority to repurchase its own shares of capital stock "refers to 'direct and indirect' purchases and thus includes a subsidiary's purchases of the parent's stock." Barbara Black, *Corporate Dividends and Stock Repurchases,* 6–13 n. 51 (1991). Black further noted that under California law, restrictions on a corporation's purchase of its own shares "are imposed not only on the corporation, but also on any of its subsidiaries. Cal.Corp.Code §§ 166, 500–03." *Id.* at 6–17 n. 86.

*Stewart,* 61 N.C.App. 112, 300 S.E.2d 263 (1983) [26]; *cf. Union Bankers Insurance Co. v. Commissioner,* 64 T.C. 807, 1975 WL 3176 (1975) (for purposes of taxation, purchase by wholly-owned subsidiary of its parent company's stock from the parent's controlling shareholder resulted in constructive dividend from subsidiary to parent and distribution by the parent in redemption of its stock from controlling shareholder).

While the relevance and application of these and related authorities to the case at bar is unclear, it is apparent that disposition of this claim should await further briefing and further development of the factual record, particularly since the purposes underlying the statutory dividend payment and stock repurchase restrictions appear to be at stake here. Accordingly, defendants' motion to dismiss this claim will be denied.

### G. Count XIX: Alter Ego Theory of Liability

In the final count of its amended complaint, relying generally on the factual allegations set forth in that pleading, plaintiff claims that defendants "exercised complete dominion and control over DIA, causing it to make transfers to or for the benefit of [defendants and others] in fraud of creditors and in violation of covenants in contracts intended for the protection of creditors." (D.I. 3, item 12 at ¶ 108) Defendants move for dismissal of this count, contending that it lacks sufficient specificity to give notice of the nature of the claim asserted and the grounds upon which it rests. Plaintiff responds by explaining, for the first time, that this count asserts an "alter ego cause of action" by which plaintiff seeks to pierce the DIA corporate veil to hold defendants liable for DIA's debts.

Defendants contend that Count XIX should be dismissed because the authorities relied upon by plaintiff in support of its alter ego claim "address imposition of liability on a parent or controlling shareholder for the debts of its subsidiary" and "do not support imposing liability on the parent (Reliance Capital) of the parent (DIC) of a subsidiary (DIA) (or, as the case would be here, entities with even more tenuous ties to the subsidiary), absent allegations that would justify disregarding the separate corporate existence of the intervening entity." (D.I. 6 at 41) Defendants further explain that plaintiff's " 'veil-piercing' allegations" "would at most support piercing the corporate veil between DIA and DIC." (*Id.*)

Plaintiff suggests, however, that defendants can be liable under a "veil piercing" or "alter ego" theory of liability because defendants directly or indirectly controlled Reliance Capital, which in turn controlled DIC. Plaintiff's claim is that defendants used their position of domination and control over DIC to further their interests by causing DIA (DIC's wholly-owned subsidiary) to make transfers and incur debts solely for the benefit of defendants (and others) to the detriment of DIA and its creditors. Plaintiff's theory can be summarized as follows: Where a subsidiary corporation (here DIA) is dominated and controlled by its parent company's parent (here Reliance Capital) or, as alleged here, by the parties that own and control the parent company's parent (i.e., the parties owning and controlling Reliance Capital), and where that domination and control is used to cause the subsidiary to make transfers for the benefit of the controlling parties (to the detriment of the subsidiary) and to further

26. In *Bell Bakeries,* a creditor claimed that its debtor violated certain provisions of a loan agreement restricting the debtor-corporation's payment of dividends. The debtor-corporation was a wholly-owned subsidiary that undertook to pay interest on the parent's debentures. The court held that the subsidiary's payment of the parent's debt, which obviously resulted because of the parent's controlling ownership of the subsidiary, was properly treated as payment of a dividend from the subsidiary to the parent, although the subsidiary had neither paid anything directly to the parent nor declared a dividend.

The court thus concluded that the creditor had a proper basis for asserting a claim based on the loan agreement term restricting the subsidiary's payment of dividends which reduced the corporation's working capital below a specified amount. *See Corporate Dividends and Stock Repurchases, supra,* at 1–3 ("[d]istributions of corporate assets to the shareholders may be dividends, even if the board of directors did not formally declare a dividend, and even if neither the directors nor the shareholders considered the distributions as dividends").

the interests of the controlling parties (rather than the interests of the subsidiary), then the controlling parties are properly treated as the subsidiary's alter ego and may be held liable for the subsidiary's debts and obligations—particularly debts associated with the transfers made for the controlling parties' benefit.

Plaintiff's theory is not completely without supporting authority. In the *Crowthers McCall* case discussed *supra* and relied upon by plaintiff in support of its alter ego claim, the plaintiff asserted a similar theory of liability which withstood a motion to dismiss for failure to state a claim. In that case TLC Pattern, Inc. (the corporation analogous to DIA) had as its principal shareholder an entity named TLC Group, Inc. (the corporation analogous to DIC). TLC Group, Inc., in turn, was owned and allegedly controlled by Reginald Lewis (a natural person analogous to Reliance Capital). The plaintiff in *Crowthers McCall* successfully pleaded a claim against Lewis which is much like the alter ego claim raised by plaintiff here.

Although the *Crowthers McCall* case does not specifically address the argument raised here, the court did conclude that the allegations against Lewis were sufficient to state a claim. In so concluding, the court explained:

Here the complaint alleges a series of transactions involving Lewis and entities controlled by him which could support a finding that Lewis used TLC Pattern and Crowthers Pattern to enrich himself to the detriment of the corporations and their creditors. For example, the plaintiff alleges that Lewis caused TLC Pattern to engage in a purported "sale/leaseback" transaction, in which TLC Holdings (a wholly-owned subsidiary of TLC Group, which was owned by Lewis) purchased TLC Pattern's manufacturing facility for approximately one-third of its fair market value and then leased the facility to TLC Pattern, which agreed to pay over ten years at least twice the facility's fair market value. The complaint also alleges that Lewis caused TLC Pattern to pay more than $15 million for stock warrants that TLC Group had acquired for only $3.1 million, leaving TLC Pattern with a negative net worth

and a capital account deficit. Finally, at the heart of the complaint is the claim that Lewis caused Crowthers Pattern to incur, without consideration, $35 million in debt in connection with the Crowthers LBO. Although Crowthers Pattern received nothing in that transaction, Lewis received $52 million directly and an additional $3 million through TLC Holdings.

These allegations paint a portrait of a corporation that was dominated by Lewis and during the relevant time period transacted business in a way that favored Lewis' interests rather than its own.

*Id.* at 1002.

It is, therefore, inaccurate to suggest that the authorities relied upon by plaintiff "do not support imposing liability on the parent (Reliance Capital) of the parent (DIC) of a subsidiary (DIA) (or, as the case would be here, entities with even more tenuous ties to the subsidiary), absent allegations that would justify disregarding the separate corporate existence of the intervening entity." Rather, it would seem that the *Crowthers McCall* case, which involves transactions and claims very similar to those at bar, inferentially supports just such a theory of liability.

Moreover, there may be sound policy reasons for rejecting defendants' position. It is conceded that if defendants directly owned and controlled DIA, then plaintiff's " 'veil-piercing' allegations" "would ... support piercing the corporate veil between DIA and [defendants]." (*Id.*) Defendants contend, however, that such alter ego claims can be defeated and defendants can insulate themselves from liability by using corporate intermediaries and other complex business structures, thereby indirectly doing that which lawfully cannot be accomplished directly. Not surprisingly, defendants offer no specific authority supporting their implicit suggestion that the law is susceptible to such manipulation.

In any event, as plaintiff aptly notes, "the nature and extent of the dominion and control exercised by [defendants] over DIA is a question of fact, not subject to resolution on a motion to dismiss." (D.I. 21 at 16) Consequently, defendants' motion to dismiss this count will be denied.

## IV. CONCLUSION

For the reasons explained, defendants' motion to dismiss the amended complaint will be denied, except as to counts VII, XVI and XVII, which will be dismissed as duplicative.

An Order consistent with this Memorandum Opinion shall issue forthwith.