**JACKSON NATIONAL LIFE INSURANCE COMPANY, Plaintiff,**

v.

**GREYCLIFF PARTNERS, LTD., Greycliff Partners, Alfred C. Eckert, III, Mikael Salovaara, South Street Corporate Recovery Fund I, L.P., South Street Leveraged Corporate Recovery Fund, L.P., and South Street Corporate Recovery Fund I (International), L.P., Defendants.**

No. 97–C–1137.

United States District Court, E.D. Wisconsin.

Sept. 22, 1998.

Brian Smigelski, Friebert, Finerty & St. John, Milwaukee, WI, John H. Doyle, III, Anderson Kill & Olick, P.C., New York City, for plaintiff.

Stephen L. Morgan, Murphy & Desmond, Madison, WI, Howard A. Pollack, Godfrey & Kahn, Milwaukee, WI, Daniel Ross, Sharfman, Siviglia, Poret, Kook, Ross & Shanman, P.C., New York City, Stephen P. Hurley, Hurley, Burish & Milliken, Madison, WI, Adam J. Kaiser, Sills Cummis Zuckerman Radin Tischman Epstein & Gross, Newark, NJ, for defendants.

### DECISION AND ORDER

MYRON L. GORDON, District Judge.

Plaintiff Jackson National Life Insurance Company ["Jackson"] alleges claims of fraud, breach of fiduciary duty, aiding and abetting the breach of fiduciary duty, civil conspiracy and unjust enrichment against the defendants. A number of motions are pending. Three are motions to dismiss pursuant to Rule 12(b), Fed.R.Civ.P., filed by the following defendants:

1) Motion of defendants Alfred C. Eckert III, South Street Corporate Recovery Fund I, L.P., South Street Leveraged Corporate Recovery Fund, L.P. and South Street Corporate Recovery Fund I (Inter-

national), L.P. [collectively, excluding Mr. Eckert, the "South Street Funds"];

2) Motion of defendant Mikael Salovaara; and

3) Motion of defendants Greycliff Partners, Ltd. ["Greycliff Ltd."] and Greycliff Partners.

In addition to his Rule 12(b) motion, defendant Salovaara moves to transfer this case to the Southern District of New York or, alternatively, to stay these proceedings. He also moves for dismissal of this action as a sanction pursuant to Rule 11, Fed.R.Civ.P. Finally, Mr. Salovaara seeks the disqualification of counsel for defendants Eckert and the South Street Funds on the basis of an alleged conflict of interest. For reasons discussed below, I will decide the disqualification motion in a later opinion.

## I. Factual and Procedural Background

This case arises out of the bankruptcy proceedings of Bucyrus–Erie Company and its parent, B–E Holdings, Inc. [collectively, "Bucyrus"], and a 1992 financing transaction involving Bucyrus and the defendants that occurred before the bankruptcy filing. The facts set forth below are taken from the allegations in Jackson's complaint, which I must accept as true for the purpose of deciding the defendants' motions. *Zinermon v. Burch*, 494 U.S. 113, 118, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990). Jackson was a creditor of Bucyrus prior to its bankruptcy by virtue of its purchase in 1990 of $60 million in principal amount of "Bucyrus' 12.5% Resettable Senior Notes due January 1, 1996" [the "Reset Notes"]. (Compl. ¶ 4.)

Defendants Salovaara and Eckert, both residents of New Jersey, were co-owners of defendant Greycliff Ltd., a Delaware corporation that provided financial advisory services to Bucyrus. Upon the November 1993 dissolution of Greycliff Ltd., Mr. Salovaara and Mr. Eckert became partners in defendant Greycliff Partners, also a financial advisory service. Mr. Salovaara, Mr. Eckert, and Greycliff Partners managed the South Street investment funds. (Compl. ¶ 5–9.)

At the heart of Jackson's complaint is a fraudulent scheme, among the defendants and the law firm of Milbank, Tweed, Hadley & McCloy ["Milbank"], counsel for the defendants and Bucyrus, to "plunder Bucyrus for their own gain." In 1992, the scheme caused an insolvent Bucyrus to enter into a multi-million dollar fraudulent conveyance of its assets, in the form of a "sale-leaseback" financing transaction [the "sale-leaseback"], to the South Street Funds. The scheme culminated during the subsequent bankruptcy proceedings of Bucyrus, where the defendants fraudulently conspired with Milbank to control the outcome of the bankruptcy case and ensure that they would profit from the unlawful sale-leaseback. As part of their scheme, the defendants failed to disclose, and Mr. Salovaara affirmatively concealed, their relationship with the debtors' counsel. The scheme succeeded. The bankruptcy court allowed the secured claim of the South Street Funds arising from the sale-leaseback, and it confirmed a plan of reorganization that contained partial releases of the defendants. Furthermore, Jackson was induced to agree to the plan and give up valuable claims that it could have asserted against the defendants during the proceedings. As a result, Jackson sustained damages because it recovered less on its claim against the debtors' estates than it would have received absent the defendants' scheme. (*See generally* Compl. at ¶¶ 40–84.)

The relationship between the defendants, Bucyrus and Milbank began in 1986, when Mr. Salovaara and Mr. Eckert were at Goldman Sachs & Co. ["Goldman"], which acted as financial advisor to Bucyrus. Bucyrus was represented at that time by attorney Lawrence Lederman. Mr. Lederman was a senior partner at Wachtell, Lipton, Rosen & Katz ["Wachtell"], but he later joined Milbank in late 1991, bringing with him, as clients, Bucyrus and all of the defendants. Bucyrus was never told that Milbank concurrently represented the defendants. (Compl. ¶ 11–12.)

In 1988, Goldman and a management group from Bucyrus' predecessor corporation undertook a leveraged buy-out ["LBO"] of that company, which became Bucyrus after consummation of the LBO. Mr. Salovaara and Mr. Lederman were heavily involved in the transaction. Goldman and Wachtell received substantial fees from the LBO, and

Goldman received 49.9% of the stock of B–E Holdings. Bucyrus, on the other hand, incurred millions of dollars of debt that it could not pay and therefore became insolvent. (Compl. ¶¶ 15–20.)

Mr. Salovaara and Mr. Lederman advised Bucyrus to enter into other financing transactions in order to service its LBO debt. In 1989, Bucyrus used an "exchange offer" to restructure its LBO debt, and in 1990 it issued the Reset Notes to Jackson in the principal amount of $60 million. Both transactions drove Bucyrus deeper into insolvency. Goldman and Wachtell profited from the transactions by collecting substantial fees and, in Goldman's case, by trading in Bucyrus' public debt securities prior to the exchange offer. (Compl. ¶¶ 21–26.) As a result of a settlement agreement between Jackson and Goldman, Jackson does not assert claims here based on these transactions and seeks relief "solely for acts and omissions occurring after November 25, 1991." (Compl. ¶ 10.) On that date, Mr. Eckert and Mr. Salovaara left Goldman to form Greycliff Ltd. Mr. Eckert, Mr. Salovaara, Greycliff Ltd. and, after 1993, Greycliff Partners managed the South Street Funds. (Compl. ¶ 27.)

In 1992, Bucyrus entered into the sale-leaseback. Mr. Salovaara advised senior management that Bucyrus should enter into this transaction with the South Street Funds, despite his knowledge that filing for bankruptcy was in Bucyrus' best interests. Mr. Lederman also advised Bucyrus to enter the transaction. Thus, in July, 1992, Mr. Salovaara structured the sale of all of Bucyrus' manufacturing equipment to the South Street Funds for $18.3 million. Then, Mr. Salovaara arranged for Bucyrus to lease the equipment back at a rate of 23%. At the same time, the South Street Funds purchased $16.75 million of Bucyrus' Senior Secured Notes. (Compl. ¶¶ 40–44.) After the closing of the sale-leaseback, to increase its control over Bucyrus, the South Street Funds purchased in the open market $13.4 million of Bucyrus–Erie Company's senior notes, $458,000 of Bucyrus–Erie's sinking fund debentures, and $14.9 million of B–E Holdings senior debentures. (Compl. ¶ 58.)

Mr. Salovaara, Mr. Eckert, and Greycliff Ltd. knew or should have known that the sale-leaseback would deepen Bucyrus' insolvency and diminish its enterprise value. Nevertheless, the defendants reaped large profits from the transaction, knowing that the sale-leaseback would give the South Street Funds the status of Bucyrus' dominant senior secured creditor in the inevitable financial restructuring of Bucyrus. (Compl. ¶¶ 48–53.)

In 1993, Bucyrus announced that it would default on its debt obligations, and it retained Milbank to handle the legal side of its financial restructuring. (Compl. ¶¶ 59–60.) Bucyrus underwent chapter 11 bankruptcy proceedings in the eastern district of Wisconsin in 1993 and 1994. During these proceedings, Milbank simultaneously, and without disclosure to Bucyrus or Jackson, represented Mikael Salovaara and the South Street Funds, Bucyrus' creditors, in other matters. (Compl. ¶¶ 62–67.) None of the defendants revealed the conflict of interest; indeed, Mr. Salovaara affirmatively tried to keep the dual representation a secret. (Compl. ¶ 68.)

The defendants therefore had leverage over Bucyrus' bankruptcy counsel. (Compl. ¶ 71.) As a result, the defendants caused Milbank to conduct the proceedings in a manner that would release them from liability for their wrongdoing while maximizing their recoveries at the expense of Bucyrus and Jackson. (Compl. ¶¶ 79–82.) In addition, Mr. Salovaara and Milbank fraudulently induced Jackson to vote in favor of the Second Amended Plan of Reorganization [the "Plan"] and waive certain claims it could have asserted against the defendants during the bankruptcy proceedings. (Compl. ¶ 83.) Mr. Salovaara and Milbank also induced Jackson to consent to Bucyrus' settlement of its breach of fiduciary duty and fraudulent conveyance claims against the South Street Funds arising out of the sale-leaseback. Jackson was induced into taking these actions because Mr. Salovaara and Milbank fraudulently concealed Milbank's continuing representations of Mr. Salovaara and his affiliates. (Compl. ¶ 84.)

Jackson claims that all the defendants are liable for common law fraud; that Mr. Salo-

vaara, Mr. Eckert, Greycliff Ltd., and Greycliff Partners are liable for their breach of fiduciary duty to Jackson; that Mr. Salovaara, Mr. Eckert, Greycliff Partners, and Greycliff Ltd. aided and abetted the breach of fiduciary duty owed to Jackson by the senior management of Bucyrus; and that all the defendants were unjustly enriched. (Compl. ¶¶ 86–107.) Jackson makes these claims in two separate lawsuits that are pending in this court. In the present case ["*Jackson II*"], Jackson asserts claims individually, in its capacity as a creditor of Bucyrus. In the other action ["*Jackson I*"], Jackson asserts similar claims in its capacity as "court-appointed representative" of the debtors' estates. This decision deals only with Jackson's claims as a creditor of Bucyrus.

## II. Analysis

■ Preliminarily, I must address whether Mr. Salovaara's motion to disqualify must be resolved before I can address the other pending motions. The motion seeks to disqualify the law firms of Sharfman, Siviglia, Poret, Kook, Ross & Shanman and Godfrey & Kahn, both of whom represent Mr. Eckert and the South Street Funds. Mr. Salovaara contends that the law firms owe conflicting duties to Mr. Eckert, the South Street Funds and Mr. Salovaara because of their direct or indirect representation of each of them. Mr. Salovaara filed the motion on May 4, 1998, several months after all of the other pending motions were filed and just prior to the completion of voluminous briefing on the other motions.

Now that the briefing on the motion to disqualify is finished, I conclude that the disqualification motion does not require that I delay ruling on the other motions. To begin with, no party has requested that I do so. Second, even if I grant the disqualification motion, it will have no impact upon the disposition of the other motions. Mr. Salovaara does not claim that the motion to dismiss of Mr. Eckert and the South Street Funds has prejudiced him in this litigation. In fact, it seems clear from all of the pleadings and documents that the interests of Mr. Salovaara, on the one hand, and Mr. Eckert and the South Street Funds on the other, are aligned insofar as the previously-filed mo-

tions are concerned. Under these circumstances, a future finding of a disqualifying conflict would not appear to affect retroactively the decision on these motions. *See First Wisconsin Mortgage Trust v. First Wisconsin Corp.*, 584 F.2d 201, 211 (7th Cir. 1978) (en banc) (where no improper advantage had been secured, replacement counsel were entitled to use prior work product of disqualified counsel). Accordingly, I intend to decide the motion to disqualify in a subsequent opinion and now turn to the other, previously-filed motions.

### A. Res Judicata and Release

The doctrine of res judicata (also known as claim preclusion), along with the related argument that they were released, form the primary basis for the motions to dismiss of Mr. Salovaara, Mr. Eckert and the South Street Funds. The Greycliff defendants join in these arguments, as well as nearly all of the other arguments and motions of the other defendants.

The defendants invoke the concepts in several ways. First, the defendants assert that the Plan determined the validity of the South Street Funds' claim in connection the sale-leaseback. Consequently, the defendants argue, res judicata bars Jackson from bringing claims related to the sale-leaseback in this court. Second, the defendants contend that the Plan, which operates as a judgment of the bankruptcy court, specifically releases their claims. Third, defendants argue that even if the Plan doesn't specifically release Jackson's claims, Jackson was required expressly to reserve its claims in the Plan in order to avoid the res judicata effect of the allowance of the South Street Funds' claim. Because it failed to do so, the defendants contend, Jackson's claims do not survive confirmation of the Plan. Finally, in an argument not related to the effect of the Plan, defendants claim that Jackson's prior, voluntary dismissal of similar actions, first in the Southern District of New York and then in Delaware, have triggered the "two-dismissal rule" of Delaware Superior Court Rule 41(a)(1). According to defendants' interpretation of this rule, Jackson's dismissal of the Delaware actions constitutes a judgment on

the merits, thereby barring Jackson's present complaint, once again under res judicata principles. For the reasons discussed below, none of these arguments provide a basis for dismissal.

### 1. Res judicata based on allowance of the sale-leaseback claim

■■■ The doctrine of res judicata bars relitigation of claims that were or could have been litigated in a prior proceeding. *D & K Properties Crystal Lake v. Mutual Life Ins. Co. of New York*, 112 F.3d 257, 259 (7th Cir.1997). Three elements must exist before the doctrine will bar a claim: (1) an identity of parties or their privies in the earlier and later proceedings, (2) an identity of causes of action between the earlier and later proceedings, and (3) a final judgment on the merits in the earlier proceeding. *Id.* A confirmed plan of reorganization functions as a final judgment for res judicata purposes. *Id.* Jackson does not dispute that it and the defendants were parties to the Bucyrus bankruptcy proceedings, nor does Jackson deny that a plan of reorganization operates as a final judgment. So the key issue here is whether there is an identity of causes of action between the earlier and later proceedings.

■■■ The defendants argue that identity of causes of action exists because Jackson asserted facts in the bankruptcy proceeding, prior to confirmation of the Plan, relating to the legality of the sale-leaseback. For example, according to Mr. Eckert and the South Street Funds, Jackson asserted that the South Street Funds damaged Bucyrus by delaying a bankruptcy filing that should have occurred at the time of the sale-leaseback. According to Mr. Salovaara, Jackson previously asserted that the sale-leaseback was a fraudulent conveyance and that Mr. Salovaara engaged in wilful misconduct in connection with that transaction. Ultimately, Jackson did not object to the secured claim of the South Street Funds arising out of the sale-leaseback. The claim was allowed, and pursuant to the Plan, the South Street Funds received a distribution on account of this claim. In essence, the defendants argue that the claims in the bankruptcy and the claims

in the complaint arise out of the same transaction: the 1992 sale-leaseback.

Jackson, for its part, does not dispute that the South Street Funds' secured claim was allowed, nor does it argue that it did not previously raise issues regarding the sale-leaseback. Rather, Jackson maintains that the claims that it raises here are "fundamentally different from those at issue in the bankruptcy case." According to Jackson, its present claims arise out of the alleged fraudulent scheme that the defendants and Milbank perpetrated during the course of the bankruptcy proceedings. In carrying out the scheme, the defendants fraudulently concealed that they were in league with the debtors' law firm, and thereby induced Jackson to vote for the Plan and give up its claims against them. Jackson alleges that it did not discover this fraud until 1996, long after the bankruptcy court confirmed the Plan, and therefore could not have brought its claims during the bankruptcy proceeding.

■■■ An identity of causes of action exists when both the earlier and later claims arise out of the same transaction, which is defined for res judicata purposes as a "single core of operative facts giving rise to a remedy." *Doe v. Allied–Signal, Inc.*, 985 F.2d 908, 913 (7th Cir.1993); *accord Herrmann v. Cencom Cable Associates, Inc.*, 999 F.2d 223, 226 (7th Cir.1993) ("[W]e suggest that two claims are one ... if they are based on the same, or nearly the same, factual allegations"). While there is some factual overlap between the bankruptcy claims and those in the complaint, they do not involve a single core of operative fact. This becomes clear after comparing the claims in the bankruptcy and the claims alleged here. For example, to challenge successfully the sale-leaseback as a fraudulent transfer, Jackson (assuming it would have had standing to do so in the bankruptcy) would have had to prove either (1) that Bucyrus received inadequate consideration and that the transaction left it insolvent (constructive fraudulent transfer) *or* (2) that the sale-leaseback was entered with intent to hinder, delay or defraud creditors (actual fraudulent transfer). *See generally* Wis.Stat. §§ 242.01 to 242.09; N.Y. Debt. & Cred.Law §§ 273–276. To prevail on its

fraud claim in this case, by contrast, Jackson needs to establish that (1) defendants misrepresented or fraudulently concealed their relationship with debtors' counsel during the bankruptcy, (2) knowledge of the relationship would have been material to Jackson, (3) Jackson reasonably relied on the misrepresentation and (4) was damaged as a result.

There is not much factual overlap between these claims. At most, the sale-leaseback *might be a but-for cause* of the claims in this case. (The defendants have not convinced me of this, since it seems possible from the allegations of the complaint that Jackson could prove a set of facts that, if asserted in the bankruptcy, might have warranted equitable subordination (11 U.S.C. § 510(c)) of the South Street Funds' claims even if the sale-leaseback was legal.) Assuming without deciding that the sale-leaseback is a but-for cause of Jackson's claims in this case, such a connection does not suffice. As the court of appeals for the seventh circuit has noted in applying the same transaction test, "[a] but-for test ... is obviously no good (as has long been understood in tort, antitrust, and other cases)." *Herrmann,* 999 F.2d at 226 (rejecting argument that prior COBRA claim barred later Title VII claim, where both claims were causally linked by the termination of plaintiff's employment but were otherwise distinct). *See also Allied–Signal,* 985 F.2d at 914 (res judicata did not apply, even though second claim probably would not have been possible but for facts giving rise to the first claim, because the key factual transactions were distinct).

Cases applying res judicata in the bankruptcy context further confirm that the doctrine does not apply here. In *Board of Trustees of Trucking Employees of North Jersey Welfare Fund, Inc. v. Centra,* 983 F.2d 495 (3d Cir.1992), the court rejected a res judicata argument on facts similar to those present here. In *Centra,* a bankruptcy court had entered an order approving a settlement agreement between the plaintiff, the debtor and the debtor's parent. *Id.* at 499. The settlement and order covered an ERISA claim that the plaintiff, a pension fund, had against the debtor and its parent. *Id.* at 497–98. After the order became final, the

plaintiff brought its ERISA claim against the parent in federal district court, claiming, *inter alia,* that the settlement was void because of the debtor's misrepresentations. *Id.* at 499–500. The court of appeals for the third circuit rejected the defendant's res judicata argument because the facts underlying the bankruptcy court's order were different from the factual basis for the federal court action:

> The bankruptcy proceeding arose from [the debtor's] withdrawal from the Pension Fund and its resulting [liability]. The factual predicates for the matter now before us are allegations that [the debtor's] misconduct induced the [plaintiff] to sign the agreement and that the [plaintiff] properly rescinded the settlement due to [the debtor's] breach of its contractual obligations. At the time the bankruptcy court approved the settlement agreement, the [plaintiff] was unaware of [the debtor's] alleged misrepresentations.... Yet [defendant] insists that the [plaintiff] should have brought to the court's attention claims of which it was completely unaware.... [Defendant's] argument is indefensible.

*Id.* at 504–05.

The reasoning in *Centra* applies with equal force here. Here, like *Centra,* the plaintiff is claiming that it was fraudulently induced to relinquish its claims. Jackson has also alleged that it was not aware of the fraud until after the bankruptcy court's order. Finally, there seems to be less factual overlap here than in *Centra.* Under these circumstances, the claims in Jackson's complaint do not arise out of the same core of operative facts as the claims involved in the bankruptcy case. *See also In re Stoecker,* 5 F.3d 1022, 1025–26, 1030–31 (7th Cir.1993) (bankruptcy court's order approving settlement of bankruptcy trustee's preference claim against bank was not res judicata as to trustee's subsequent preference claim against the same bank arising out of the same loan, because the first preference claim involved interest payments made in December 1988 and January 1989, whereas the later preference claim involved judgment liens obtained by the bank in February 1989).

The purpose behind the same transaction test is to determine whether a

claim could have been asserted in the earlier proceeding. *Allied–Signal,* 985 F.2d at 913. If a plaintiff is unaware of facts when it brought the earlier claim, res judicata will not bar a subsequent claim based on those facts. *Id.* at 914. Jackson alleges that it did not discover defendants' fraud during the bankruptcy proceedings until after the Plan was confirmed, and this court must accept this allegation as true at this stage of the litigation. Accordingly, res judicata does not apply.

This holding is dictated by the foregoing precedent and does not conflict with any of the cases cited by the defendants. Specifically, all of the cases cited by defendants are inapposite for one or more of the following reasons: (1) the claims arose from the same set of operative facts, (2) the later claim could have been brought before the earlier judgment, and (3) specific language in the judgment expressly prohibited the later claim. *See, e.g., D & K Properties Crystal Lake v. Mutual Life Ins. Co. of New York,* 112 F.3d 257, 259 (7th Cir.1997) (debtor-plaintiff conceded that it could have brought action before plan confirmation); *Secon Service System, Inc. v. St. Joseph Bank & Trust Co.,* 855 F.2d 406, 409–10 (7th Cir.1988) (claims arose out of same core of operative facts, "certainly could have been asserted" in the bankruptcy proceeding, and were specifically extinguished by express language in the court's order); *Miller v. Meinhard–Commercial Corp.,* 462 F.2d 358, 360–61 (5th Cir. 1972) (claims involved same cause of action, plaintiff had notice of fraudulent acts prior to judgment and elected not to raise them).

**2. Release and res judicata based on the provisions of the Plan**

■ The defendants rely heavily on certain release provisions contained in the Plan. Jackson, on the other hand, claims that these provisions permit it to bring its claims. The relevant provisions provide as follows:

> 9.03 All payments and distributions received hereunder by Holders of Allowed Claims against and Allowed Equity Interests in the Debtors or the Reorganized Debtor shall be final and shall not be subject to avoidance, disgorgement, reallo-

cation or challenge in respect to all Causes of Action by reason of, arising from, or in connection with or related in any way to the Released Matters (as defined below). Except as provided in Sections 9.04 and 9.05, as of the Effective Date, the Debtors and the Reorganized Debtor (collectively, the *"Releasors"*) shall be deemed, for good and valuable consideration, to have released and discharged all holders of Allowed Claims against and all holders of Allowed Equity Interests in the Debtors or the reorganized Debtor, and any and all of their respective successors, predecessors, assignors, assignees, parent, subsidiaries, stockholders, affiliates, present and former directors, trustees, officers, employees, agents, attorneys, accountants, investment bankers and financial advisors, and in the case of a partnership, its present and former partners, and in the case of individuals, their respective heirs, receivers, conservators, beneficiaries, executors and administrators (and any other person who, within the meaning of Rule 12b–2 promulgated under the Securities Exchange Act of 1934, as amended, "controls," is "controlled by" or is under "common control" with, any of such persons), past or present, (collectively, the *"Released Persons"*) from any and all Causes of Action (including claims which the Debtors or Debtors in Possession have legal power to assert, compromise or settle in connection with the Chapter 11 Cases) any of the Releasors ever had, now has, hereafter can, shall or may have against any of the released Persons by reason of, arising from or in connection with or related in any way to (i) the Becor Transactions, (ii) the administration, collection or renegotiation of the Impaired Debt Securities, (iii) the acquisition or disposition by any Released Person of, or any other action taken or not taken by any Released Person in connection with, or the status of any Released Person as a holder of, any indebtedness or equity or debt securities of, the Debtors or the Reorganized Debtor or (iv) the restructuring of the claims and Equity Interests which are the subject of this Plan and the negotiation, formulation or preparation of the Plan (items (i) through (iv) are

collectively referred to as the *"Released Matters"*).

9.04 The release contained in Section 9.03 shall not apply to or otherwise release any Cause of Action which a releasor may have against the Broad Street Fund, Goldman, the South Street Funds, Greycliff Partners, Ltd. or any of their respective successors, predecessors, assignors, assignees, parent, subsidiaries, stockholders, affiliates, present and former directors, trustees, officers, employees, agents, attorneys, accountants, investment bankers and financial advisors, and in the case of a partnership, its present and former partners, and in the case of individuals, their respective heirs, receivers, conservators, beneficiaries, executors and administrators (and any other person who, within the meaning of Rule 12b–2 promulgated under the Securities Exchange Act of 1934, as amended, "controls," is "controlled by" or is under "common control" with, any of such persons), past or present, in each case acting in such capacity (collectively, the *"Non–Released Persons"*), other than a Cause of Action relating to an Allowed Claim or allowed Equity Interest.

Section 9.03 contains two sentences, each of which prohibit or release certain claims or actions. Section 9.04 is an exception to the release in section 9.03. Ignoring the first sentence of section 9.03 for a moment, the rest of these two sections clearly do not apply to Jackson's claims. Unburdened by its numerous modifiers and definitions, the second sentence of section 9.03 provides that the "Releasors" release the "Released Persons" from claims involving "Released Matters." While the defendants expend considerable energy on explaining why they are "Released Persons" and how Jackson's claims involve "Released Matters," they do not even try to argue that Jackson is a "Releasor." This is because the "Releasors" are plainly defined as "the Debtor and the Reorganized Debtor." Jackson is neither. Thus, the lengthy release in section 9.03 is irrelevant because Jackson did not give it. Since the release does not apply to Jackson, section 9.04, which is a carve-out from that release, is also inapplicable.

That leaves the first sentence of section 9.03, which is harder to interpret. This does not seem like a release in the strict sense that the second sentence is. Rather, it broadly prohibits claims that would subject payments or distributions under the Plan to "avoidance, disgorgement, reallocation or challenge." The defendants argue that this lawsuit violates this prohibition because it seeks to avoid or challenge the distribution that the South Street Funds received on account of its sale-leaseback claim.

This argument fails to provide a basis for dismissal for several reasons. First, to the extent the argument has any merit, it would only apply to Jackson's claims against the South Street Funds, since they received the distribution that purportedly is being "challenged." It would be unreasonable to say that Jackson's claims against the other defendants are an effort to avoid a Plan distribution that those defendants did not even receive. Second, as noted previously, Jackson's complaint relates primarily to conduct that occurred during the bankruptcy proceedings and only indirectly involves the sale-leaseback. Under these circumstances, characterizing Jackson's claims as an action to avoid or disgorge the payment that the South Street Funds received on its sale-leaseback claim would also be unreasonable. Third, if the parties to the Plan had really intended to release the defendants from the claims of other creditors, they could have done better than the first sentence of section 9.03. For example, they could have included "Jackson" or "the debtors' creditors" among the definition of "Releasors" in the release provision of section 9.03. Nowhere does section 9.03 use such terms. *Compare, e.g., Secon Service System, Inc. v. St. Joseph Bank & Trust Co.,* 855 F.2d 406, 409–10 (7th Cir.1988) (court's order approving compromise agreement provided that "Neither the Debtors ... nor *any creditor* of the Debtor shall have the right to assert any claim ... against the Bank") (emphasis added). Given the history of litigation between these parties, it is hard to believe that they could not have drafted a better third-party release if they had intended to do so. Finally, I find that the first sentence of section 9.03 is am-

biguous and therefore cannot form a basis for dismissal of the complaint.

### 3. Res judicata based on Jackson's failure expressly to reserve its claims

Defendants claim that even if the Plan does not release them, Jackson was required expressly to reserve its claims in the Plan in order to avoid the res judicata effect of the allowance of the South Street Funds' secured claim. *See D & K Properties Crystal Lake v. Mutual Life Ins. Co. of New York*, 112 F.3d 257, 259–60 (7th Cir. 1997) (recognizing exception to the doctrine of res judicata where the court in the prior action expressly reserves the litigant's right to bring the later claims). I need not address this argument because I have already held that allowance of the South Street Funds' claim does not have a res judicata effect upon Jackson's complaint. Therefore, it is not necessary to decide whether Jackson qualifies for the exception to res judicata recognized in *D & K*.

### 4. The "two-dismissal rule"

Delaware Superior Court Rule 41(a)(1), which is substantially identical to Rule 41(a)(1), Fed.R.Civ.P., provides:

> Unless otherwise stated in the notice of dismissal or stipulation, the dismissal is without prejudice, except that a notice of dismissal operates as an adjudication upon the merits when filed by a plaintiff who [h]as [sic] once dismissed in any court of the United States or of any state an action based on or including the same claim.

In January 1998, Jackson dismissed two actions that it had filed in Delaware, alleging the same claims that it brings in this case and *Jackson I,* which is also pending in this court. Almost two years earlier, in March 1996, Jackson dismissed an action that it had filed against the defendants in the Southern District of New York ["SDNY action"], which asserted claims related to the sale-leaseback. Defendants contend that the SDNY action involved the "same claim" as the Delaware actions. Thus, pursuant to Rule 41(a)(1), the defendants argue that the dismissal of the Delaware actions was an adjudication on the merits, thus prohibiting Jackson from bringing this action.

Defendants concede that the definition of "same claim" for purposes of Rule 41(a)(1) is basically the same as the same "transaction" or "core of operative facts" test that applies in the res judicata context. The SDNY action alleged claims relating to the sale-leaseback transaction. The Delaware actions, like the present action, asserted claims based on the defendants' alleged fraudulent scheme during the bankruptcy proceedings. Based on the allegations in the complaint, Jackson discovered this fraud in December 1996, which was after it had dismissed the SDNY action. For the same reasons that the claims in this case do not arise out of the same core of operative facts as the claims in the bankruptcy case (see above discussion), I hold that the claims in the Delaware actions were not the same as those in the SDNY action. Accordingly, Rule 41(a)(1) does not apply.

Finally, defendants make the alternative argument that even absent the SDNY dismissal, the dismissal of the Delaware actions alone triggers the two-dismissal rule. The argument is meritless because the two Delaware actions do not involve the same claims. In one action, Jackson brought *its own claims*, in its capacity as a creditor of Bucyrus. In the other action, by contrast, Jackson asserted *Bucyrus' claims*, in its capacity as court-appointed representative of the debtors' estates. Thus, the actions were brought by legally-distinct plaintiffs asserting two completely different sets of legal rights.

### B. Standing of Jackson

Defendants contend that Jackson's complaint should be dismissed because it lacks standing to bring its claims. Mr. Eckert and the South Street Funds argue that Jackson lacks standing because the Plan does not expressly reserve its claims, citing *D & K.* This argument merely restates a res judicata argument that was disposed of in the previous section, and it will not be addressed here.

Mr. Salovaara raises a more substantial argument. He claims that Jackson's complaint runs afoul of the settled rule that a creditor of a debtor corporation does not

have standing to bring claims based on conduct that directly injured the corporation, but only indirectly injured the creditor. *Wooten v. Loshbough,* 951 F.2d 768, 770–71 (7th Cir.1991); *Jackson National Life Ins. Co. v. Ligator,* 949 F.Supp. 200, 204 (S.D.N.Y.1996). The rule permits the injured corporation to pursue the claim for the benefit of all creditors, thereby preventing double recoveries. *Wooten,* 951 F.2d at 770–71. In the bankruptcy context, it also prevents creditors from upsetting the creditor priorities established by bankruptcy law, since the claim of the directly-injured debtor is an asset of the bankruptcy estate that should be pursued by the trustee or debtor-in-possession on behalf of all creditors. *Id.* at 770. Jackson acknowledges the rule but argues that its claims are based on direct rather than derivative injury. For the reasons discussed below, I find that Mr. Salovaara's argument raises difficult issues that cannot be resolved at this stage in the litigation.

■ Some of Jackson's claims are obviously based on derivative injuries. Jackson's breach of fiduciary duty claim, for example, is based in large part on Mr. Salovaara's advising Bucyrus to enter the sale-leaseback and to delay filing for bankruptcy. (Compl. ¶ 91.) This claim is for an injury—depletion of Bucyrus' assets and harm to its financial condition—that affected Bucyrus directly. Mr. Salovaara's conduct injured Jackson only indirectly, by making Bucyrus unable to pay its debts. *See Wooten,* 951 F.2d at 771.

■ On the other hand, Jackson's claim for aiding and abetting the breach of fiduciary duty does not conflict with the direct injury rule. This claim asserts that the defendants aided and abetted Bucyrus' management in violating the fiduciary duty that Bucyrus, because of its insolvency, owed to Jackson. This type of claim belongs to creditors, and does not belong to the bankrupt corporation. *In re Mediators, Inc.,* 105 F.3d 822, 825, 826 (2d Cir.1997) (stating that a claim against a third party for aiding and abetting fiduciary's breach of duty to creditors belongs to creditors and not the corporation).

■ With respect to the claims arising out of the bankruptcy fraud, which Jackson argues is at the heart of this case, the issue of standing raises difficult questions regarding the distinction between direct and indirect injury. Reading the allegations of the complaint in the light most favorable to the plaintiff, Jackson, as a party to the bankruptcy proceedings, was itself defrauded and induced to consent to the Plan. The fact that the tortious conduct was directed at Jackson, and not just Bucyrus, tends to distinguish this case from the cases cited by Mr. Salovaara. *See, e.g., Ligator,* 949 F.Supp. at 204 (plaintiff was a creditor of an allegedly defrauded purchaser, and was injured only because the purchaser's injury prevented it from repaying the plaintiff); *Wooten,* 951 F.2d at 770–71 (plaintiff became a creditor a decade after the fraudulent scheme began and was not "a target of the fraud"). However, much of the injury alleged by Jackson stems from its claim that the defendants got more from the bankruptcy estate then they should have. This injury forms the basis for the claims in *Jackson I,* where Jackson is asserting the debtors' claims against the defendants. This claim of the debtors, if successful, will result in recovery to Jackson even more directly than in the usual case, since the Plan assigns these claims to Jackson. The unique facts alleged here—tortious conduct specifically directed at the creditor, coupled with damages that overlap somewhat with those suffered by the debtors—present questions that are not squarely addressed by the cases upon which the parties rely.

The case cited by the plaintiff, *Bankers Trust Company v. Rhoades,* 859 F.2d 1096 (2d Cir.1988), *cert. denied,* 490 U.S. 1007, 109 S.Ct. 1642, 104 L.Ed.2d 158 (1989), provides some guidance but is not conclusive. In that case, a creditor brought a RICO claim against the debtor's officers. *Id.* at 1098. Allegedly, the officers had conspired to fraudulently conceal a major asset from its creditors. The defendants concealed the asset during the debtor's bankruptcy proceedings, where it induced the plaintiff to consent to the debtor's plan of reorganization. *Id.* at 1098–99. In a further effort to hinder the plaintiff, the defendants initiated frivolous

lawsuits against it and bribed a judge in order to obtain favorable decisions. *Id.* at 1099. Under these circumstances, the court held that the creditor had suffered direct injury and therefore had standing to sue. *Id.* at 1101. The court also noted, however, that certain of the plaintiff's damages overlapped with those sought by the debtor corporation in another action. Consequently, the court dismissed one of the plaintiff's claims, without prejudice, due to the speculative nature of the damages. *Id.* at 1106. *Bankers Trust* provides some support for Jackson's position, but that case had more compelling facts than those alleged here, and part of the court's discussion of standing relied upon the RICO statute (*id.* at 1100–01), which is not relevant here.

Another potentially relevant issue is whether Jackson's dual status as a major creditor and as the assignee of the debtors' claims should affect the standing question in this case. As mentioned previously, a major purpose of the direct injury rule is to avoid upsetting the creditor priorities established by bankruptcy law. *Wooten,* 951 F.2d at 770. This does not appear to be a concern here because of Jackson's dual status as creditor and assignee of the debtors' claims. Thus, any recoveries in either *Jackson I* or *Jackson II* will inure to Jackson. This issue is not addressed by the parties or in the cases cited by them.

Essentially, the "court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984). The standing question in this case raises difficult and novel issues of law, and I decline to decide them on a motion to dismiss. *See In re Buckhead America Corp.,* 178 B.R. 956, 961 (D.Del.1994) (denying motion to dismiss in part because it involved complex transactions and novel issues of law that had not been sufficiently briefed); *Branch v. FDIC,* 825 F.Supp. 384, 397 (D.Mass.1993) ("Novel theories of recovery are best tested for legal sufficiency in light of actual, rather than alleged facts"). Furthermore, though the parties engaged in voluminous briefing, they

did not sufficiently address the standing issues in this case. Mr. Salovaara was the only defendant to raise the direct injury rule, and the "kitchen-sink" approach of his many briefs and motions precluded an in-depth analysis of this issue. *See Buckhead,* 178 B.R. at 961 (D.Del.1994) ("although the parties' extensive briefing has crystallized certain issues, others were not sufficiently developed to enable their proper disposition"). I conclude that the standing issue raised by Mr. Salovaara is better left for decision at a later date, after the parties have completed discovery and submitted more complete briefing. *See Id.*

## C. Sufficiency of Jackson's claims

The defendants offer many arguments in support of their contention that each of Jackson's claims fail to state a cause of action. A few of them merit brief discussion.

### 1. Fraud

Mr. Salovaara argues that Jackson fails to allege a claim for fraud under New York law. Assuming without deciding that New York law applies, I find this argument unpersuasive.

According to Mr. Salovaara, Jackson has failed to allege an affirmative misrepresentation, a duty to disclose, and reasonable reliance. With respect to the lack of an affirmative misrepresentation, I note that under New York law, the lack of an affirmative misstatement is not fatal to a claim for fraudulent misrepresentation where the circumstances create a duty to disclose. *See Bethka v. Jensen,* —— A.D.2d ——, 672 N.Y.S.2d 494, 495 (1998). A duty to disclose arises when the defendant engages in some conduct, beyond mere silence, that rises to the level of active concealment. *Id.* Here, Jackson has alleged specific acts of active concealment on the part of Mr. Salovaara that go beyond the failure to speak. (*See, e.g.,* Compl. ¶¶ 67–69.) A duty will also arise if the defendant "has superior knowledge not available" to the plaintiff and knows that the plaintiff is acting on mistaken knowledge. *Aaron, Ferer & Sons v. Chase Manhattan Bank,* 731 F.2d 112, 123 (2d Cir.1984). The facts alleged in the complaint satisfy this

requirement. Finally, as to Mr. Salovaara's argument that Jackson could not reasonably have relied on any nondisclosure by him, I decline his invitation to resolve issues of fact on a motion to dismiss. *See Bethka,* 672 N.Y.S.2d at 495 (1998).

### 2. Breach of fiduciary duty

■■■ Among other reasons, Mr. Salovaara contends that Jackson's breach of fiduciary duty claim must fail because the allegations of the complaint establish no such duty between Mr. Salovaara and Jackson. Mr. Salovaara is correct. Jackson does not allege that any relationship existed between it and Mr. Salovaara prior to the bankruptcy. Moreover, creditors in a bankruptcy proceeding do not owe each other fiduciary duties. *See In re Granite Partners, L.P.,* 210 B.R. 508, 516 (Bankr.S.D.N.Y.1997) (other than to its constituents as a whole, creditors' committee does not owe duty to any other party). Jackson offers only a single, conclusory statement as to why it was owed this duty: "[B]ecause Bucyrus was insolvent ... Salovaara's fiduciary duties ran directly to its creditors, including Jackson." Jackson does not cite any authority to support this bald conclusion. While Bucyrus' insolvency might explain why its management or controlling shareholders owed a fiduciary duty to creditors, *see Pepper v. Litton,* 308 U.S. 295, 306, 60 S.Ct. 238, 84 L.Ed. 281 (1939), Mr. Salovaara was neither. Without any authority or argument to guide me, I am unprepared to find that Mr. Salovaara owed any fiduciary duty to Jackson. Accordingly, the breach of fiduciary duty claim will be dismissed.

### 3. Dismissal of Greycliff Ltd. based on its dissolution

■■■ Defendant Greycliff Ltd. asserts that all claims against it are barred by Delaware corporate statutes because it has ceased to exist. Section 278 of the Delaware General Corporation Law provides:

All corporations, whether they expire by their own limitation or are otherwise dissolved, shall nevertheless be continued, for the term of three years from such expiration or dissolution or for such longer period as the Court of Chancery shall in its discretion direct, bodies corporate for the purpose of prosecuting and defending suits, whether civil, criminal or administrative....

Del.Code Ann., tit. 8, § 278 (1997). Jackson concedes that Delaware courts have applied this statute to bar claims against corporations that have been dissolved for more than three years. *See In re RegO Co.,* 623 A.2d 92, 96 (Del.Ch.1992). Jackson claims, however, that Delaware courts have not yet applied the statute in a case involving fraudulent concealment, and argues that the court should apply the doctrine of equitable tolling, which Delaware courts have previously applied to statutes of limitation. I decline to become the first court to create an equitable exception to the plain language of this statute. Furthermore, I am persuaded by Greycliff Ltd.'s argument that, unlike situations involving equitable tolling of a statute of limitations, the question here is not whether equity should permit the plaintiff to bring its claims, but whether this court has the power to resurrect a corporation that has ceased to exist by operation of law. I conclude that it does not. *See In re Citadel Industries, Inc.,* 423 A.2d 500, 507 (1980) (section 278 "gives this Court no power to 'continue' a corporation for winding up purposes on an application made after the statutory three-year period has expired and thus after the corporation has ceased to exist"). Accordingly, Jackson's claims against Greycliff Ltd. will be dismissed.

### 4. Other arguments

I have considered the remaining arguments of the defendants that Jackson has failed sufficiently to allege its claims. I will not discuss them here because they are obviously lacking in merit.

### D. Salovaara's Motion to Transfer or Stay

■■■ Mr. Salovaara has moved to transfer this action to the Southern District of New York or, alternatively, to stay these proceedings pending the outcome of the similar cases that Jackson had filed in Delaware. The alternative motion to stay is moot because Jackson voluntarily dismissed the Delaware actions after Mr. Salovaara filed his motion.

As to the motion to transfer, it will be denied. Similar motions were filed in *Jackson I* by the defendants, including Mr. Salovaara. On February 3, 1998, Magistrate Judge William E. Callahan, Jr. denied the motions to transfer, and I have adopted that order. *Jackson National Life Ins. Co. v. Greycliff Partners, Ltd.,* 2 F.Supp.2d 1164, 1169 (E.D.Wis.1998). Magistrate Judge Callahan's opinion disposed of arguments that are substantially the same as the ones that Mr. Salovaara makes in support of his motion in this case. I can see no reason, nor has Mr. Salovaara offered one, why the result in this case should be any different from the result reached in *Jackson I,* which involves the same parties and similar claims. The court will deny the motion to transfer.

### E. Salovaara's Motion to Dismiss the Complaint as a Sanction Pursuant to Rule 11

Mr. Salovaara has moved to dismiss this action as a sanction pursuant Rule 11, Fed.R.Civ.P., based on the claim that Jackson has repeatedly filed duplicative lawsuits against the defendants for the improper purpose of harassing them. While it is clear that Jackson has filed several actions against the defendants, I cannot conclude that this, in and of itself, demonstrates an improper purpose.

Mr. Salovaara does not argue that Jackson's claims are frivolous, and I have held that most of them state legally-sufficient claims. I am reluctant to conclude that a colorable complaint was filed for an improper purpose in the absence of compelling evidence to that effect. Only the companion actions in Delaware and in this court are truly duplicative, since they were the only ones involving the alleged bankruptcy fraud. Jackson has voluntarily dismissed the Delaware actions, shortly after the 21–day "safe harbor" provided by Rule 11 had expired. *See* Fed.R.Civ.P. 11(c)(1)(A). The only concrete facts offered by Mr. Salovaara are that Jackson has filed several lawsuits against the defendants. As Mr. Salovaara concedes, "forum-shopping," in and of itself, is insufficient to show an improper motive. *See Sussman v. Bank of Israel,* 56 F.3d 450 (2d Cir.), *cert.*

*denied,* 516 U.S. 916, 116 S.Ct. 305, 133 L.Ed.2d 210 (1995). Thus, in order to find that Jackson has engaged in an abuse of the judicial process, I would have to accept at face value Mr. Salovaara's characterizations of Jackson's motives. Such statements do not provide a basis for the imposition of sanctions. Mr. Salovaara's motion pursuant to Rule 11 will be denied.

Therefore, IT IS ORDERED that the motion, as amended, of Mr. Eckert and the South Street Funds to dismiss pursuant to Rules 12(b)(2), 9(b) and 12(b)(6), Fed.R.Civ. P., be and hereby is denied.

IT IS ALSO ORDERED that Mr. Salovaara's motion to dismiss pursuant to Fed. R.Civ.P. 12(b)(6) be and hereby is (1) granted with respect to Jackson's second claim for relief (breach of fiduciary duty) and (2) denied in all other respects.

IT IS FURTHER ORDERED that the motion of Greycliff Partners, Ltd. and Greycliff Partners to dismiss pursuant to Rules 12(b)(2) and 12(b)(6), Fed.R.Civ.P., be and hereby is (1) granted with respect to all of Jackson's claims against Greycliff Partners, Ltd., (2) granted with respect to Jackson's second claim for relief (breach of fiduciary duty) and (3) denied in all other respects.

IT IS FURTHER ORDERED that Mr. Salovaara's motion to transfer be and hereby is denied.

IT IS FURTHER ORDERED that the motion to transfer of Greycliff Partners, Ltd. and Greycliff Partners be and hereby is denied.

IT IS FURTHER ORDERED that Mr. Salovaara's motion to stay proceedings be and hereby is dismissed as moot.

IT IS FURTHER ORDERED that the motion of Greycliff Partners, Ltd. and Greycliff Partners to stay proceedings be and hereby is dismissed as moot.

IT IS FURTHER ORDERED that Mr. Salovaara's motion to dismiss as a sanction pursuant to Fed.R.Civ.P. 11 be and hereby is denied.