**JACKSON NATIONAL LIFE INSURANCE COMPANY, as Court–Appointed Representative of the Estates of the Debtor Companies Bucyrus–Erie Company and B–E Holdings, Inc., Plaintiff,**

v.

**GREYCLIFF PARTNERS, LTD., Greycliff Partners, Alfred C. Eckert, III, Mikael Salovaara, South Street Corporate Recovery Fund I, L.P., South Street Leveraged Corporate Recovery Fund, L.P., and South Street Corporate Recovery Fund I (International), L.P., Defendants.**

No. 96–C–476.

United States District Court,
E.D. Wisconsin.

Nov. 13, 1998.

Bruce G. Arnold, Whyte, Hirschboeck & Dudek, Milwaukee, WI, Kevin N. Starkey, Anderson, Kill & Olick, New York City, for Plaintiff.

Stephen L. Morgan, Murphy & Desmond, Madison, WI, for Defendants Greycliff Partners Ltd. & Greycliff Partners.

Howard A. Pollack, Godfrey & Kahn, Milwaukee, WI, Daniel Ross, Sharfman, Siviglia, Poret, Kook, Ross & Shanman, P.C., New York City, for Defendant Alfred C. Eckert, III.

Adam J. Kaiser, Sills, Cummis, Zuckerman, Radin, Tischman, Epstein & Gross, Newark, NJ, Stephen P. Hurley & Marcus J. Berghahn, Hurley, Burish & Milliken, Madison, WI, for Defendant Mikael Salovaara.

## DECISION AND ORDER

MYRON L. GORDON, District Judge.

Plaintiff Jackson National Life Insurance Company ["Jackson"] is the court-appointed representative of the bankruptcy estates of Bucyrus–Erie Company and its parent, B–E Holdings, Inc. [collectively, "Bucyrus"]. In that capacity, Jackson alleges claims of fraud, breach of fiduciary duty, aiding and abetting the breach of fiduciary duty and unjust enrichment against the defendants. This is the court's decision on the following three motions filed by the defendants:

1) Motion to dismiss of defendants Alfred C. Eckert III, South Street Corporate Recovery Fund I, L.P., South Street Leveraged Corporate Recovery Fund, L.P. and South Street Corporate Recovery Fund I (International), L.P. [collectively, excluding Mr. Eckert, the "South Street Funds"];

2) Motion to dismiss of defendant Mikael Salovaara; and

3) Motion to dismiss of defendants Greycliff Partners, Ltd. and Greycliff Partners.

### I. Factual and Procedural Background

This case arises out of the bankruptcy proceedings of Bucyrus and a 1992 financing transaction involving Bucyrus and the defendants that occurred before the bankruptcy filing. Jackson became a creditor of Bucyrus in 1990 when it purchased $60 million in principal amount of "Bucyrus' 12.5% Resettable Senior Notes due January 1, 1996" [the "Reset Notes"]. Bucyrus' Second Amended Joint Plan of Reorganization [the "Plan"], which was confirmed by the bankruptcy court, gives Jackson the authority to pursue certain of Bucyrus' claims as the "representative of the debtors' estates." In this capacity, Jackson asserts Bucyrus' claims against

the defendants. The facts set forth below are taken from the allegations in Jackson's complaint, which are accepted as true for the purpose of deciding the defendants' motions. *Zinermon v. Burch,* 494 U.S. 113, 118, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990).

Defendants Salovaara and Eckert, both residents of New Jersey, were co-owners of defendant Greycliff Partners, Ltd., a Delaware corporation that provided financial advisory services to Bucyrus. Upon the November 1993 dissolution of Greycliff Partners, Ltd., Mr. Salovaara and Mr. Eckert became partners in defendant Greycliff Partners, also a financial advisory service. Mr. Salovaara, Mr. Eckert, and Greycliff Partners managed the South Street investment funds. (Second Amended Complaint ["Compl."] ¶¶ 6–10.)

At the heart of Jackson's complaint is its charge that there was a fraudulent scheme among the defendants and the law firm of Milbank, Tweed, Hadley & McCloy ["Milbank"], counsel for the defendants and Bucyrus, to "plunder Bucyrus for their own gain." In 1992, the scheme allegedly caused an insolvent Bucyrus to enter into a multi-million dollar fraudulent conveyance of its assets, in the form of a "sale-leaseback" financing transaction [the "sale-leaseback"], to the South Street Funds. The scheme culminated during the subsequent bankruptcy proceedings of Bucyrus, where the defendants fraudulently conspired with Milbank to control the outcome of the bankruptcy case and ensure that they would profit from the unlawful sale-leaseback. As part of their plan, the defendants failed to disclose, and Mr. Salovaara affirmatively concealed, their relationship with the debtors' counsel. The plaintiff claims that the scheme succeeded. The bankruptcy court allowed the secured claim of the South Street Funds arising from the sale-leaseback, and it confirmed a plan of reorganization that contained partial releases of the defendants. As a result, Bucyrus sustained damages, including the loss of the companies' enterprise value and the release of valuable claims that Bucyrus had against the defendants. (*See generally* Compl. at ¶¶ 2–3, 44–87.)

The relationship between the defendants, Bucyrus and Milbank began in 1986, when Mr. Salovaara and Mr. Eckert were employed at Goldman Sachs & Co. ["Goldman"], which acted as financial advisor to Bucyrus. Bucyrus was represented at that time by attorney Lawrence Lederman. Mr. Lederman was a senior partner at Wachtell, Lipton, Rosen & Katz ["Wachtell"], but he later joined Milbank in late 1991, bringing with him, as clients, Bucyrus and all of the defendants. Bucyrus was never told that Milbank concurrently represented the defendants. (Compl. ¶¶ 14–15.)

In 1988, Goldman and a management group from Bucyrus' predecessor corporation undertook a leveraged buy-out ["LBO"] of that company, which became Bucyrus after consummation of the LBO. Mr. Salovaara and Mr. Lederman were heavily involved in the transaction. Goldman and Wachtell received substantial fees from the LBO, and Goldman received 49.9% of the stock of B–E Holdings. Bucyrus, on the other hand, incurred millions of dollars of debt that it could not pay and therefore became insolvent. (Compl. ¶¶ 18–23.)

Mr. Salovaara and Mr. Lederman advised Bucyrus to enter into other financing transactions in order to service its LBO debt. In 1989, Bucyrus used an "exchange offer" to restructure its LBO debt, and in 1990 it issued the Reset Notes to Jackson in the principal amount of $60 million. Both transactions drove Bucyrus deeper into insolvency. Goldman and Wachtell profited from the transactions by collecting . substantial fees and, in Goldman's case, by trading in Bucyrus' public debt securities prior to the exchange offer. (Compl. ¶¶ 24–29.) As a result of a settlement agreement between Jackson and Goldman, Jackson does not assert claims here based on these transactions and seeks relief "solely for acts and omissions occurring after November 25, 1991." (Compl. ¶ 11.) On that date, Mr. Eckert and Mr. Salovaara left Goldman to form Greycliff Partners, Ltd. Mr. Eckert, Mr. Salovaara, Greycliff Partners, Ltd. and, after 1993, Greycliff Partners managed the South Street Funds. (Compl. ¶ 37.)

In 1992, Bucyrus entered into the sale-leaseback. Mr. Salovaara advised senior management that Bucyrus should enter into this transaction with the South Street Funds, despite his knowledge that filing for bankruptcy was in Bucyrus' best interests. Mr. Lederman also advised Bucyrus to enter the transaction. Thus, in July, 1992, Mr. Salovaara structured the sale of all of Bucyrus' manufacturing equipment to the South Street Funds for $18.3 million. Then, Mr. Salovaara arranged for Bucyrus to lease the equipment back at a rate of 23%. At the same time, the South Street Funds purchased $16.75 million of Bucyrus' Senior Secured Notes. (Compl.¶¶ 44–48.) After the closing of the sale-leaseback, to increase its control over Bucyrus, the South Street Funds purchased large amounts of Bucyrus' debt securities in the open market. (Compl.¶¶ 61–62.)

Mr. Salovaara, Mr. Eckert, and Greycliff Partners, Ltd. knew or should have known that the sale-leaseback would deepen Bucyrus' insolvency and diminish its enterprise value. Nevertheless, the defendants reaped large profits from the transaction, knowing that the sale-leaseback would give the South Street Funds the status of Bucyrus' dominant senior secured creditor in the inevitable financial restructuring of Bucyrus. (Compl.¶¶ 51–57.)

In 1993, Bucyrus announced that it would default on its debt obligations, and it retained Milbank to handle the legal side of its financial restructuring. (Compl.¶ 63.) Bucyrus underwent chapter 11 bankruptcy proceedings in the eastern district of Wisconsin in 1993 and 1994. During these proceedings, Milbank simultaneously, and without disclosure to Bucyrus, represented Mikael Salovaara and the South Street Funds, Bucyrus' creditors, in other matters. (Compl.¶¶ 5, 66–74.) None of the defendants revealed the conflict of interest; indeed, Mr. Salovaara affirmatively tried to keep the dual representation a secret. (Compl.¶ 72–79.)

The defendants therefore had leverage over Bucyrus' bankruptcy counsel. (Compl.¶ 75.) As a result, the defendants caused Milbank to conduct the proceedings in a manner that would release them from liability for their wrongdoing while maximizing their recoveries at the expense of Bucyrus. (Compl.¶¶ 82–83.) In keeping with this plan, the defendants induced Bucyrus to settle valuable claims against them for breach of fiduciary duty and fraudulent conveyance in connection with the sale-leaseback. (Compl.¶ 86.)

Jackson claims that all the defendants are liable for common law fraud; that Mr. Salovaara, Mr. Eckert, Greycliff Partners, Ltd. and Greycliff Partners are liable for the breach of their fiduciary duty to Bucyrus; that Mr. Salovaara, Mr. Eckert, Greycliff Partners, and Greycliff Partners, Ltd. aided and abetted the breach of fiduciary duty owed by the senior management of Bucyrus; and that all the defendants were unjustly enriched. (Compl.¶¶ 88–105.) Jackson makes these claims in two separate lawsuits that are pending in this court. In the instant case, number 96–C–476 [*"Jackson I"*], Jackson asserts Bucyrus' claims in its capacity as "court-appointed representative" of the debtors' estates. In the other action, number 97–C–1137 [*"Jackson II"*], Jackson asserts similar claims individually, in its capacity as a creditor of Bucyrus. Throughout this opinion, I will refer to my September 22, 1998 decision in *Jackson II*, as it deals with motions that are substantially similar to the defendants' motions in the instant case.

## II. Analysis

The second amended complaint ["complaint"] in this action and the complaint in *Jackson II* are very similar. They allege the same set of facts and assert nearly the same claims. The primary difference between the two complaints is that in *Jackson I* the plaintiff asserts Bucyrus' claims, whereas in *Jackson II* it brings its own claims. The defendants' motions to dismiss are likewise very similar to the motions that they made in *Jackson II*. The parties acknowledge this, and their briefs repeat or incorporate by reference many of the same arguments that they made in *Jackson II*.

I will use the same technique here. For the most part, the court's rulings in *Jackson II* apply equally to this case, and I will adopt most of them. However, the aforementioned distinction between this case and *Jackson II*

sometimes changes the analysis of certain issues. These issues will be discussed in greater detail below.

## A. Res Judicata Based on Allowance of the Sale–Leaseback Claim

■ The doctrine of res judicata (also known as claim preclusion) forms the primary basis for the motions to dismiss of all of the defendants. The defendants' main res judicata argument is that the Plan determined the validity of the South Street Funds' claim in connection the sale-leaseback. Consequently, the defendants argue, res judicata bars Jackson from bringing claims related to the sale-leaseback in this court, especially since the Plan did not expressly reserve the right to pursue the claims that Jackson asserts now in this case.

In *Jackson II,* I held that the bankruptcy court's allowance of the South Street Funds' sale-leaseback claim did not have a res judicata effect upon Jackson's claims in that case. The same is true here, for the same reasons discussed at length in *Jackson II. See Jackson National Life Ins. Co. v. Greycliff Partners, Ltd.,* 226 B.R. 407, 413–415 (E.D.Wis.1998). Both here and in *Jackson II,* res judicata does not apply because Jackson's claims do not arise out of the "same core of operative facts" that formed the basis for the bankruptcy claims arising out of the sale-leaseback. *See Doe v. Allied–Signal, Inc.,* 985 F.2d 908, 913 (7th Cir.1993). While there is some factual overlap between the bankruptcy claims and Jackson's claims in this case, the latter relate primarily to a fraudulent scheme carried out after the sale-leaseback and during the course of the bankruptcy proceedings. Jackson alleges that it and Bucyrus did not discover this fraud until 1996, long after the bankruptcy court confirmed the plan. Thus, the court must assume that Bucyrus could not have brought (or expressly reserved) these claims during the bankruptcy proceedings. *See Jackson,* 226 B.R. 407, 413–415. Under these circumstances, the claims in this case and the claims in the bankruptcy do not share a single core of operative facts. Accordingly, the allowance of the South Street Funds' sale-lease-

back claim is not res judicata as to Jackson's complaint in this action.

## B. Release Based on the Provisions of the Plan

■ The defendants argue that certain release provisions in the Plan specifically bar Jackson's claims. Jackson, on the other hand, claims that these provisions permit it to bring its claims. Although the same provisions were discussed in *Jackson II,* the issue there was how they applied to Jackson. The issue here, by contrast, is how the release applies to Bucyrus. This issue is more difficult.

The relevant provisions of the Plan provide as follows:

9.03 All payments and distributions received hereunder by Holders of Allowed Claims against and Allowed Equity Interests in the Debtors or the Reorganized Debtor shall be final and shall not be subject to avoidance, disgorgement, reallocation or challenge in respect to all Causes of Action by reason of, arising from, or in connection with or related in any way to the Released Matters (as defined below). Except as provided in Sections 9.04 and 9.05, as of the Effective Date, the Debtors and the Reorganized Debtor (collectively, the *"Releasors"*) shall be deemed, for good and valuable consideration, to have released and discharged all holders of Allowed Claims against and all holders of Allowed Equity Interests in the Debtors or the reorganized Debtor, and any and all of their respective successors, predecessors, assignors, assignees, parent, subsidiaries, stockholders, affiliates, present and former directors, trustees, officers, employees, agents, attorneys, accountants, investment bankers and financial advisors, and in the case of a partnership, its present and former partners, and in the case of individuals, their respective heirs, receivers, conservators, beneficiaries, executors and administrators (and any other person who, within the meaning of Rule 12b–2 promulgated under the Securities Exchange Act of 1934, as amended, "controls," is "controlled by" or is under "common control" with, any of such persons),

past or present, (collectively, the *"Released Persons"*) from any and all Causes of Action (including claims which the Debtors or Debtors in Possession have legal power to assert, compromise or settle in connection with the Chapter 11 Cases) any of the Releasors ever had, now has, hereafter can, shall or may have against any of the released Persons by reason of, arising from or in connection with or related in any way to (i) the Becor Transactions, (ii) the administration, collection or renegotiation of the Impaired Debt Securities, (iii) the acquisition or disposition by any Released Person of, or any other action taken or not taken by any Released Person in connection with, or the status of any Released Person as a holder of, any indebtedness or equity or debt securities of, the Debtors or the Reorganized Debtor or (iv) the restructuring of the claims and Equity Interests which are the subject of this Plan and the negotiation, formulation or preparation of the Plan (items (i) through (iv) are collectively referred to as the *"Released Matters"*).

9.04 The release contained in Section 9.03 shall not apply to or otherwise release any Cause of Action which a releasor may have against the Broad Street Fund, Goldman, the South Street Funds, Greycliff Partners, Ltd. or any of their respective successors, predecessors, assignors, assignees, parent, subsidiaries, stockholders, affiliates, present and former directors, trustees, officers, employees, agents, attorneys, accountants, investment bankers and financial advisors, and in the case of a partnership, its present and former partners, and in the case of individuals, their respective heirs, receivers, conservators, beneficiaries, executors and administrators (and any other person who, within the meaning of Rule 12b–2 promulgated under the Securities Exchange Act of 1934, as amended, "controls," is "controlled by" or is under "common control" with, any of such persons), past or present, in each case acting in such capacity (collectively, the *"Non–Released Persons"*), other than a Cause of Action relating to an Allowed Claim or allowed Equity Interest.

As noted in my ruling in *Jackson II*, these provisions can be divided into three parts. The first sentence of Section 9.03 is a prohibition or injunction against claims that would subject payments or distributions under the Plan to "avoidance, disgorgement, reallocation or challenge." The second sentence of Section 9.03 is a broad release, and Section 9.04 is an exception or "carve-out" from the release. *Jackson II*, 226 B.R. at 416–417.

As to the injunction in the first sentence of Section 9.03, I am unable to conclude at this time that it bars Jackson's claims, for reasons set forth in *Jackson II. See Id.* This case is best described as an action for damages sustained by Bucyrus as a result of the defendants' fraud during the bankruptcy proceedings. The action relates directly to this alleged conduct and only indirectly involves the sale-leaseback claim of the South Street Funds. Jackson does not seek "avoidance, disgorgement" or "reallocation" of the Plan's distribution to the South Street Funds, nor does it directly "challenge" that distribution. At this stage of the proceedings, the court cannot hold that the first sentence of Section 9.03 prohibits Jackson's claims.

That leaves for the court's attention the release (the second sentence of Section 9.03) and the carve-out (Section 9.04). In *Jackson II*, I held that the lengthy release contained in the second sentence of Section 9.03 was irrelevant because Jackson plainly was not a "releasor." In this case, however, the release clearly is relevant because the Bucyrus debtors are the "releasors." The release also includes the defendants as "releasees" because the South Street Funds were "holders of Allowed Claims" and the other defendants were "affiliates" or "agents" of the South Street Funds. Furthermore, it appears that the release covers Jackson's claims in this case. The release applies to any claims that the Bucyrus debtors "ever had, now has, *hereafter can, shall or may have* ... arising from or in connection with or related *in any way* " (emphasis added) to the "Released Matters," which include the sale-leaseback and the formulation of the Plan. This language is broad; it covers future claims, and it applies to claims that are

only indirectly related to released matters. Thus, read in isolation, the release in Section 9.03 would seem to bar the claims in this action.

The exception in Section 9.04, however, specifically excludes claims against the defendants from the release in Section 9.03, "other than a Cause of Action relating to an Allowed Claim." This section therefore renders the release irrelevant, unless the claims in this case can be viewed as "relating to" to the South Street Funds sale-leaseback claim, which was allowed by the bankruptcy court. Thus, whether the plaintiff can pursue this action depends upon the meaning of the words "relating to." For the reasons discussed below, I conclude that this phrase, as it is used in Section 9.04 of the Plan, is susceptible to two plausible interpretations, one of which favors the plaintiff. This ambiguity precludes dismissal of the complaint at this stage of the litigation. *Cushing v. City of Chicago,* 3 F.3d 1156, 1163 (7th Cir.1993).

Under a literal interpretation of Section 9.04, it is difficult to say that the claims in this case do not somehow relate to the South Street Funds' sale-leaseback claim. According to the plaintiff, the sale-leaseback transaction was a fraudulent conveyance that was part of the defendants' larger scheme to "plunder Bucyrus for their own gain," a scheme which culminated in the defendants' fraud during the bankruptcy proceedings. As such, the sale-leaseback is the but-for cause of a large portion of the plaintiff's claimed damages. *See Compl.* at ¶¶ 3 and 86 (defendant Salovaara fraudulently induced Bucyrus to settle "potentially in excess of $100 million" in claims against the South Street Funds, including claims for fraudulent conveyance and breach of fiduciary duty "in connection with the Sale–Leaseback transaction"). Given this connection, an arguable conclusion is that the Plan bars Jackson's complaint because it relates to the South Street Funds' allowed claim.

However, there is another permissible reading of Section 9.04 that would permit Jackson's claims to survive. This reading looks to the context of the Plan and recognizes that Sections 9.03 and 9.04 are designed to operate in conjunction with each other.

The second sentence of Section 9.03 is a broad release, and Section 9.04 contains both an exception to the release and an exception to the exception. In order to make sense within the whole, each of these components—the release, the exception, and the exception to the exception—must define a successively narrower set of claims. For example, if the exception is as broad as the release, then the release is pointless, and if the exception to the carve-out is as broad as the carve-out or the release itself, then the carve-out is superfluous.

The "relating to" language of Section 9.04 is consistent with this principle. These words, when contrasted with the use of the broader phrase "arising from or in connection with or related in any way" in Section 9.03, contemplate a fairly direct connection. This helps to make the exception to the carve-out more narrow than the release itself. As noted above and in *Jackson II,* Jackson's claims relate primarily to fraudulent conduct that occurred after the sale-leaseback. Moreover, while Section 9.03 clearly covers future claims, the language of Section 9.04 is ambiguous on this point. Thus, the connection between this action and the sale-leaseback may be too remote for Jackson's claims to qualify as "relating to" the South Street Funds' allowed claim.

This reading also seems consistent with the first sentence of Section 9.03 (discussed above), which prohibits claims that would subject payments on allowed claims to "avoidance, disgorgement, reallocation or challenge." The clause "other than a Cause of Action relating to an Allowed Claim" in Section 9.04 might refer to the type of "avoidance" or "disgorgement" action that the first sentence of Section 9.03 prohibits. Thus, Section 9.04 may reasonably be read as follows: "The release in section 9.03 (*i.e.* the second sentence) does not apply to claims against nonreleased persons (*e.g.* the defendants), but the prohibition against attacking allowed claims (*i.e.* the first sentence of Section 9.03) shall remain in effect." This interpretation would not bar Jackson's claims because, as mentioned previously, it does not appear that this is the type of action that the first sentence of Section 9.03 forbids.

The competing interpretations of Section 9.04 discussed above demonstrate that the meaning of Section 9.04 is ambiguous. The defendants' motions to dismiss based on the release provisions in the Plan will therefore be denied. *Cushing,* 3 F.3d at 1163.

## C. The "Two–Dismissal" Rule

In an argument not related to the effect of the Plan, defendants claim that Jackson's prior, voluntary dismissal of similar actions, first in the Southern District of New York and then in Delaware, have triggered the "two-dismissal rule" of Delaware Superior Court Rule 41(a)(1). The rule, which is substantially identical to Rule 41(a)(1), Fed. R.Civ.P., provides:

> Unless otherwise stated in the notice of dismissal or stipulation, the dismissal is without prejudice, except that a notice of dismissal operates as an adjudication upon the merits when filed by a plaintiff who [h]as [sic] once dismissed in any court of the United States or of any state an action based on or including the same claim.

According to defendants' interpretation of this rule, Jackson's recent dismissal of two Delaware actions constitutes a judgment on the merits, thereby barring Jackson's present complaint, again under res judicata principles.

■ First, the defendants contend that the SDNY action involved the "same claim" as the Delaware actions; thus, pursuant to Rule 41(a)(1), the defendants argue that the dismissal of the Delaware actions was an adjudication on the merits, prohibiting Jackson from bringing this action. However, as I stated in *Jackson II,* the SDNY action and the Delaware actions do not involve the same claim. 226 B.R. at 417. The SDNY action alleged claims relating to the sale-leaseback transaction. The Delaware actions, like the present action, asserted claims based on the defendants' alleged fraudulent scheme during the bankruptcy proceedings. Based on the allegations in the complaint, Jackson discovered this fraud in December 1996, which was after it had dismissed the SDNY action. For the same reasons that the claims in this case do not arise out of the same core of operative facts as the claims in the bankruptcy case,

the claims in the Delaware actions were not the same as those in the SDNY action. *Id.* Accordingly, Rule 41(a)(1) does not apply.

■ The defendants next argue that even absent the SDNY dismissal, the dismissal of the two Delaware actions alone triggers the two-dismissal rule. This argument also must fail because the two Delaware actions do not involve the same claims. In one action, Jackson brought *its own claims,* in its capacity as a creditor of Bucyrus. In the other action, by contrast, Jackson asserted *Bucyrus' claims,* in its capacity as court-appointed representative of the debtors' estates. Thus, the actions assert two completely different sets of legal rights. *Id.*

Defendant Salovaara argues that a nominal change of plaintiffs does not defeat the two-dismissal rule, so long as the same party-in-interest is involved, citing *Poloron Products, Inc. v. Lybrand Ross Bros. & Montgomery,* 66 F.R.D. 610, 614 (S.D.N.Y.1975), *rev'd on other grounds,* 534 F.2d 1012 (2d Cir.1975). This may be true, but the point here is that the *same claim* was not asserted in the two Delaware actions, regardless of whether both actions were filed by the same party in interest. Thus, the two-dismissal rule by its terms cannot apply, and the decision by the district court in *Poloron* is not applicable and surely not controlling in the case at bar. *See id.* at 613 (noting that it was "undisputed" that the two prior actions involved the *same* claim).

## D. Sufficiency of Jackson's claims

The defendants offer a number of arguments attacking the sufficiency of the plaintiff's claims. All of them are duplicative of arguments raised in *Jackson II,* and most of them can be dealt with in accordance with the court's rulings in that case. However, a few issues that merit separate treatment are discussed briefly below.

### 1. Standing

Mr. Salovaara incorporates by reference his argument in *Jackson II* that Jackson has no standing to assert claims that belong to Bucyrus. In *Jackson II* Jackson was assert-

ing its own claims in its capacity as a creditor of Bucyrus. In this case, by contrast, Jackson is asserting claims that belong to Bucyrus. Mr. Salovaara's standing argument simply does not apply to this case.

### 2. Breach of fiduciary duty

 In *Jackson II,* I dismissed the plaintiff's breach of fiduciary duty claim because the allegations did not establish that Mr. Salovaara owed a fiduciary to Jackson. The same result is not warranted here, where the question is whether Mr. Salovaara owed a fiduciary duty to Bucyrus. Mr. Salovaara does not argue that the allegations of the present complaint fail to establish such a duty. Rather, he argues that the allegations of the complaint are untrue. This argument raises factual issues that cannot be resolved on a motion to dismiss. *Zinermon v. Burch,* 494 U.S. 113, 118, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990). Accordingly, I will not dismiss the breach of fiduciary duty claim in this case.

### 3. Other arguments

I have considered the remaining arguments of the defendants regarding the sufficiency of Jackson's claims, and in accordance with the court's decision in *Jackson II,* I conclude that they are without merit.

### E. Dismissal of Greycliff Partners, Ltd. Based on Its Dissolution

In *Jackson II,* I dismissed defendant Greycliff Partners, Ltd. because that entity had ceased to exist by operation of Delaware law. 226 B.R. at 420–421. Although Greycliff Partners, Ltd. does not seek dismissal on this ground in the present case, Jackson has nevertheless raised the dissolution issue in its brief. The same result reached in *Jackson II* is warranted here. Accordingly, the court will dismiss Jackson's claims against Greycliff Partners, Ltd.

Therefore, IT IS ORDERED that the motion of Mr. Eckert and the South Street Funds to dismiss the second amended complaint pursuant to Rules 12(b)(6) and 9(b), Fed.R.Civ.P., be and hereby is denied.

IT IS ALSO ORDERED that Mr. Salovaara's motion to dismiss the second amended complaint pursuant to Rules 12(b)(6) and 9(b), Fed.R.Civ.P., be and hereby is denied.

IT IS FURTHER ORDERED that the motion of Greycliff Partners, Ltd. and Greycliff Partners to dismiss pursuant to Rules 12(b)(6) and 9(b), Fed.R.Civ.P., be and hereby is denied.

IT IS FURTHER ORDERED that all of Jackson's claims against defendant Greycliff Partners, Ltd. be and hereby are dismissed, with prejudice.

IT IS FURTHER ORDERED that the plaintiff is entitled to its costs against all defendants except Greycliff Partners, Ltd. as to the motions resolved herein.